14-2027
*In re 650 Fifth Avenue and Related Properties*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

_____

August Term 2015

(Argued: November 18, 2015      Decided: July 20, 2016)

Docket No. 14-2027
_____


IN RE 650 FIFTH AVENUE AND RELATED PROPERTIES

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

FIONA HAVLISH, individually and on behalf of the Estate of Donald J. Havlish, Jr., DONALD HAVLISH, SR., SUSAN CONKLIN, WILLIAM HAVLISH, TARA BANE, individually and on behalf of the Estate of Michael A. Bane, DONALD BANE, CHRISTINA BANE-HAYES, KRYSTYNA BORYCZEWSKI, individually and on behalf of the Estate of Martin Boryczewski, ESTATE OF MICHAEL BORYCZEWSKI, JULIA BORYCZEWSKI, MICHELE BORYCZEWSKI, GRACE KNESKI, individually and on behalf of the Estate of Steven Cafiero, RICHARD A. CAPRONI, individually and on behalf of the Estate of Richard M. Caproni, DOLORES CAPRONI, CHRISTOPHER CAPRONI, MICHAEL CAPRONI, LISA CAPRONI-BROWN, CLARA CHIRCHIRILLO, individually and on behalf of the Estate of Peter Chirchirillo, LIVIA CHIRCHIRILLO, CATHERINE DEBLIECK, WILLIAM COALE, individually and on behalf of the Estate of Jeffrey Coale, FRANCES COFFEY, individually and on behalf of the Estates of Daniel M. Coffey and Jason Coffey, DANIEL D. COFFEY, M.D., KEVIN M. COFFEY, THE ESTATE OF JEFFREY COLLMAN, DWAYNE W. COLLMAN, BRIAN COLLMAN, CHARLES COLLMAN, BRENDA SORENSON, LOISANNE DIEHL, individually and on behalf of the Estate of Michael Diehl, MORRIS DORF, individually and on behalf of the Estate of

Stephen Dorf, MICHELLE DORF, ANNE MARIE DORF, ROBERT DORF, JOSEPH DORF, LINDA SAMMUT, CORAZON FERNANDEZ, individually and on behalf of the Estate of Judy Fernandez, MARIA REGINA MERWIN, individually and on behalf of the Estate of Ronald Gamboa, GRACE PARKINSON-GODSHALK, individually and on behalf of the Estate of William R. Godshalk, TINA GRAZIOSO, individually and on behalf of the Estate of John Grazioso, JIN LIU, individually and on behalf of the Estate of Liming Gu, ALAN GU, MAUREEN HALVORSON, individually and on behalf of the Estate of James D. Halvorson, MARIE ANN PAPROCKI, individually and on behalf of the Estate of Dennis Lavelle, RONI LEVINE, individually and on behalf of the Estate of Robert Levine, TERESANNE LOSTRANGIO, individually and on behalf of the Estate of Joseph Lostrangio, MARGARET MAURO, individually and on behalf of the Estate of Dorothy Mauro, RAMON MELENDEZ, individually and on behalf of the Estate of Mary Melendez, PATRICIA MILANO, individually and on behalf of the Estate of Peter T. Milano, IVY MORENO, individually and on behalf of the Estate of Yvette Nichole Moreno, JOANNE LOVETT, individually and on behalf of the Estate of Brian Nunez, ESTATE OF VINCENT A. OGNIBENE, individually and on behalf of the Estate of Philip Paul Ognibene, CHRISTINE PAPASSO, individually and on behalf of the Estate of Salvatore T. Papasso, PATRICIA J. PERRY, individually and on behalf of the Estate of John William Perry, RODNEY RATCHFORD, individually and on behalf of the Estate of Marsha Dianah Ratchford, RODNEY M. RATCHFORD, MARSHEE R. RATCHFORD, RODNEY RATCHFORD for the Benefit of Maranda C. Ratchford, JUDITH REISS, individually and on behalf of the Estate of Joshua Scott Reiss, JOYCE ANN RODAK, individually and on behalf of the Estate of John M. Rodak, CHELSEA NICOLE RODAK, JOYCE ANN RODAK for the Benefit of Devon Marie Rodak, JOHN RODAK, REGINA RODAK, JOANNE GORI, DIANE ROMERO, individually and on behalf of the Estate of Elvin Romero, LOREN ROSENTHAL, individually and on behalf of the Estate of Richard Rosenthal, EXPEDITO SANTILLIAN, individually and on behalf of the Estate of Maria Theresa Santillian, ESTER SANTILLIAN, ELLEN SARACINI, individually and on behalf of the Estate of Victor Saracini, Guardian of Anne C. Saracini, JOANNE RENZI, PAUL SCHERTZER, individually and on behalf of the Estate of Scott Schertzer, RONALD S. SLOAN, individually and on behalf of the Estate of Paul K. Sloan, ESTATE OF GEORGE ERIC SMITH, RAYMOND SMITH, KATHERINE SOULAS, individually and on behalf of the Estate of Timothy P. Soulas, RUSSA STEINER, individually and on behalf of the Estate of William R. Steiner, ANGELA S. STERGIOPOULOS, individually and on behalf of the Estate of Andrew

Stergiopoulos, GEORGE STERGIOPOULOS, individually and on behalf of the Estate of Andrew Stergiopoulos, SANDRA STRAUB, individually and on behalf of the Estate of Edward W. Straub, JOAN E. TINO, individually and on behalf of the Estate of Jennifer Tino, PAMELA SCHIELE, CHRISTINE BARTON-PENCE, individually and on behalf of the Estate of Jeanmarie Wallendorf, ESTATE OF META WALLER, DOYLE RAYMOND WARD, individually and on behalf of the Estate of Timothy Raymond Ward, GERALD BINGHAM, ALICE CARPENETO, STEPHEN L. CARTLEDGE, MICHELLE WRIGHT, HAOMIN JIAN, FUMEI CHIEN, HUICHUN JIAN, HUI-CHUAN JIAN, HUI-CHIEN CHEN, HUI-ZON JIAN, MICHAEL LOGUIDICE, RALPH S. MAERZ, MARTIN PANIK, ESTATE OF LINDA ELLEN PANIK, MARY LYNN-ANNA PANIK STANLEY, HELEN ROSENTHAL, ALEXANDER ROWE, ED RUSSIN, GLORIA RUSSIN, BARRY RUSSIN, LEONARD ZEPLIN, LEONA ZEPLIN, JOSLIN ZEPLIN,

*Claimants-Appellees*,

JASON KIRSCHENBAUM, ISABELLE KIRSCHENBAUM, on her own behalf and as Executrix of the Estate of Martin Kirschenbaum, JOSHUA KIRSCHENBAUM, DAVID KIRSCHENBAUM, DANIELLE LYNN TEITLEBAUM,

*Claimants-Appellees*,

ANNA BEER, HARRY BEER, on his own behalf and as Administrator of the Estate of Alan Beer, ESTELLE CARROLL, PHYLLIS MAISEL,

*Claimants-Appellees*,

STEVEN M. GREENBAUM, in his personal capacity and as administrator of the Estate of Judith Greenbaum, ALAN HAYMAN, SHIRLEE HAYMAN,

*Claimants-Appellees*,

CARLOS ACOSTA, MARIA ACOSTA, IRVING FRANKLIN, in his personal capacity and as personal representative of the estate of Irma Franklin, LIBBY KAHANE, in her personal capacity and as Administratrix of the Estate of Meir Kahane, NORMAN KAHANE, in his personal capacity and as Executor of the Estate of Sonia Kahane, TOVA ETTINGER, BARUCH KAHANE, CIPORAH KAPLAN, ETHEL J. GRIFFIN, as Public

3

Administrator of the County of New York and Administratrix of the Estate of Binyamin Kahane,

*Claimants-Appellees,*

EDWENA R. HEGNA, Executrix of the Estate of Charles Hegna, STEVEN A. HEGNA, LYNN MARIE HEGNA MOORE, CRAIG M. HEGNA, PAUL B. HEGNA,

*Claimants-Appellees,*

DEBORAH D. PETERSON, personal representative of the Estate of James C. Knipple,

*Claimants-Appellees,*

THE ESTATE OF MICHAEL HEISER, THE ESTATE OF GARY HEISER, FRANCIS HEISER, THE ESTATE OF LELAND TIMOTHY HAUN, IBIS S. HAUN, MILAGRITOS PEREZ-DALIS, SENATOR HAUN, THE ESTATE OF JUSTIN R. WOOD, RICHARD W. WOOD, KATHLEEN M. WOOD, SHAWN M. WOOD, THE ESTATE OF EARL F. CARTRETTE, JR., DENISE M. EICHSTAEDT, ANTHONY W. CARTRETTE, LEWIS W. CARTRETTE, THE ESTATE OF BRIAN MCVEIGH, THE ESTATE OF SANDRA M. WETMORE, JAMES V. WETMORE, THE ESTATE OF MILLARD D. CAMPBELL, MARIE R. CAMPBELL, BESSIE A. CAMPBELL, THE ESTATE OF KEVIN J. JOHNSON, SHYRL L. JOHNSON, CHE G. COLSON, KEVIN JOHNSON, JR., NICHOLAS A. JOHNSON, THE ESTATE OF LAURA E. JOHNSON, BRUCE JOHNSON, THE ESTATE OF JOSEPH E. RIMKUS, BRIDGET BROOKS, JAMES R. RIMKUS, ANNE M. RIMKUS, THE ESTATE OF BRENT E. MARTHALER, KATIE L. MARTHALER, THE ESTATE OF SHARON MARTHALER, HERMAN C. MARTHALER III, MATHEW MARTHALER, KIRK MARTHALER, THE ESTATE OF THANH VAN NGUYEN, CHRISTOPHER R. NGUYEN, THE ESTATE OF JOSHUA E. WOODY, DAWN WOODY, BERNADINE R. BEEKMAN, GEORGE M. BEEKMAN, TRACY M. SMITH, JONICA L. WOODY, TIMOTHY WOODY, THE ESTATE OF PETER J. MORGERA, MICHAEL MORGERA, THOMAS MORGERA, THE ESTATE OF KENDALL KITSON, JR., THE ESTATE OF KENDALL K. KITSON, SR., THE ESTATE OF NANCY R. KITSON, STEVEN K. KITSON, NANCY A. KITSON, THE ESTATE OF CHRISTOPHER ADAMS, CATHERINE ADAMS, JOHN E. ADAMS, PATRICK D. ADAMS, MICHAEL T. ADAMS, MARY YOUNG, ELIZABETH WOLF, WILLIAM ADAMS, THE ESTATE OF CHRISTOPHER LESTER, CECIL H. LESTER, JESSICA F. LESTER, JUDY LESTER, CECIL H. LESTER, JR., THE ESTATE OF JEREMY A. TAYLOR, LAWRENCE E. TAYLOR,

VICKI L. TAYLOR, STARLINA D. TAYLOR, THE ESTATE OF PATRICK P. FENNIG, THADDEUS C. FENNIG, CATHERINE FENNIG, PAUL D. FENNING, MARK FENNING,

*Claimants-Appellees*,

THE ESTATE OF WILLIAM R. HIGGINS, ROBIN L. HIGGINS,

*Claimants-Appellees*,

FATEMEH BAYANI, in her personal capacity and as representative of the Estate of Siavash Bayani, BANAFSHEH BAYANI, BABAK BAYANI,

*Claimants-Appellees*,

THE ESTATE OF DONNA HOLLAND, JAMES HOLLAND, CHAD HOLLAND,

*Claimants-Appellees*,

ESTATE OF KENNETH V. WELCH, LINDA WELCH, BRIAN WELCH, CHRISTOPHER WELCH, BETTY WELCH, GERARD WELCH, MICHAEL WELCH,

*Claimants-Appellees*,

CIELITO VALENCIA,

*Claimant-Appellee*,

RICHARD PAUL BREWER, JOYCE LOUIS LEYDET

*Claimant-Appellee*,

PAUL BLAIS, CURTIS A. TAYLOR, MARIA TAYLOR,

*Claimant-Appellee*,

DIANA CAMPUZANO, AVI ELISHIS, GREGG SALZMAN,

5

*Claimants-Appellees,*

–v. –

ALAVI FOUNDATION, 650 FIFTH AVENUE COMPANY,

*Claimants-Appellants,*

ASSA COMPANY LIMITED, ASSA CORPORATION,

*Claimants,*

ALL RIGHT, TITLE, AND INTEREST OF ASSA CORPORATION, ASSA COMPANY LIMITED, BANK MELLI IRAN, AND THE ALAVI FOUNDATION IN 650 FIFTH AVENUE COMPANY, including but not limited to the real property and appurtenances located at 650 Fifth Avenue, New York, New York, with all improvements and attachments thereon, and all property traceable thereto, ALL RIGHT, TITLE, AND INTEREST IN THE REAL PROPERTY AND APPURTENANCES LOCATED AT 650 FIFTH AVENUE, NEW YORK, NEW YORK, with all improvements and attachments thereon, ALL RIGHT, TITLE, AND INTEREST IN THE REAL PROPERTY AND APPURTENANCES LOCATED AT 2313 SOUTH VOSS ROAD, HOUSTON, TEXAS 77057, with all improvements and attachments thereon, ALL RIGHT, TITLE, AND INTEREST IN THE REAL PROPERTY AND APPURTENANCES LOCATED AT 55-11 QUEENS BOULEVARD, QUEENS, NEW YORK 11377, BLOCK 1325 LOTS 1, 6, 7, AND 8, with all improvements and attachments thereon, ALL RIGHT, TITLE, AND INTEREST IN THE REAL PROPERTY AND APPURTENANCES LOCATED AT 4836 MARCONI AVENUE, CARMICHAEL, CALIFORNIA 95608, with all improvements and attachments thereon, ALL RIGHT, TITLE, AND INTEREST IN THE REAL PROPERTY AND APPURTENANCES LOCATED AT 4204 ALDIE ROAD, CATHARPIN, VIRGINIA 20143-1133, with all improvements and attachments thereon, ALL RIGHT, TITLE, AND INTEREST IN THE REAL PROPERTY AND APPURTENANCES LOCATED AT 4300 ALDIE ROAD, CATHARPIN, VIRGINIA 20143-1133, with all improvements and attachments thereon, ALL RIGHT, TITLE, AND INTEREST IN THE REAL PROPERTY AND APPURTENANCES LOCATED AT 7917 MONTROSE ROAD, ROCKVILLE, MARYLAND 20854, with all improvements and attachments thereon, ALL RIGHT, TITLE, AND INTEREST IN THE REAL PROPERTY AND APPURTENANCES LOCATED AT 8100 JEB STUART ROAD, ROCKVILLE, MARYLAND 20854, with all

improvements and attachments thereon, ALL FUNDS FORMERLY ON DEPOSIT IN ACCOUNT NUMBER 78429712, AT CITIBANK, N.A., NEW YORK, NEW YORK, ALL FUNDS FORMERLY ON DEPOSIT IN ACCOUNT NUMBER 8881654552, AT CITIBANK, N.A., NEW YORK, NEW YORK, ALL FUNDS FORMERLY ON DEPOSIT IN ACCOUNT NUMBER 2724409590, AT JPMORGAN CHASE BANK, N.A., BATON ROUGE, LOUISIANA, ALL FUNDS FORMERLY ON DEPOSIT IN ACCOUNT NUMBER 725700280, AT JPMORGAN CHASE BANK, N.A., BATON ROUGE, LOUISIANA, ALL FUNDS ON DEPOSIT AT JPMORGAN CHASE BANK, N.A., IN ACCOUNT NUMBER 230484468, held in the name of 650 Fifth Avenue Company, and all funds traceable thereto, ALL FUNDS ON DEPOSIT AT JPMORGAN CHASE BANK, N.A., IN ACCOUNT NUMBER 230484476, held in the name of 650 Fifth Avenue Company, ALL FUNDS TRACEABLE THERETO, ALL FUNDS ON DEPOSIT AT STERLING NATIONAL BANK IN ACCOUNT NUMBER 3802032201, held in the name of Alavi Foundation, all funds traceable thereto, ALL FUNDS ON DEPOSIT AT STERLING NATIONAL BANK IN ACCOUNT NUMBER 3802032216, held in the name of Alavi Foundation, All funds traceable thereto, ALL FUNDS ON DEPOSIT AT STERLING NATIONAL BANK IN ACCOUNT NUMBER 3852524414, held in the name of Alavi Foundation, and all funds traceable thereto,

*Defendants-in-rem.*[*]

_____

Before:

KEARSE, RAGGI, and WESLEY, *Circuit Judges.*

_____

Appeal from an award of summary judgment by the United States District Court for the Southern District of New York (Forrest, *J.*), forfeiting Claimants' properties to the United States on two grounds: (1) as proceeds traceable to violations of the International Emergency Economic Powers Act and certain Iranian Transactions Regulations issued by the Department of the Treasury forfeitable under 18 U.S.C. § 981(a)(1)(C), and (2) as property involved in money laundering transactions forfeitable under 18 U.S.C. § 981(a)(1)(A).  Because we identify questions of fact as to whether Claimants Alavi Foundation and 650 Fifth Avenue Company acted with the knowledge necessary to support forfeiture

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

on these grounds, we conclude that forfeiture as to these Claimants could not be decided as a matter of law. We further conclude that the District Court erred in *sua sponte* considering and rejecting Claimants' statute of limitations defense, and in denying Claimants' motion to suppress evidence seized pursuant to a defective warrant on the ground of inevitable discovery without making the particularized findings required by that exception. We therefore vacate the judgment and remand for further proceedings consistent with this order.

VACATED AND REMANDED.

————————

DANIEL S. RUZUMNA, (Krista D. Adler, Adam Blumenkrantz, Melissa R. Ginsberg, *on the brief*), Patterson Belknap Webb & Tyler LLP, New York, NY, *for Claimants-Appellants*.

MICHAEL D. LOCKARD, Assistant United States Attorney for the Southern District of New York (Martin S. Bell, Carolina A. Fornos, Brian A. Jacobs, Assistant United States Attorneys, *on the brief*), for Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, *for Plaintiff-Appellee*.

————————

WESLEY, *Circuit Judge*:

On this appeal, we consider challenges to an award of summary judgment entered in the United States District Court for the Southern District of New York (Forrest, *J.*), which forfeited to the United States various claimants' interests in multiple properties, including a 36-story office building located at 650 Fifth Avenue in Manhattan ("the Building"), real properties in Maryland, Texas, California, Virginia, and New York, and the contents of several bank accounts,

(collectively, "Defendant Properties").  We also consider challenges to the September 9, 2013 order denying a motion to suppress evidence seized from the Alavi Foundation's and the 650 Fifth Avenue Company's office.  Three concerns prompt us to vacate the judgment as to Claimants Alavi Foundation ("Alavi" or "the Foundation") and the 650 Fifth Avenue Company ("650 Fifth Ave. Co." or "the Partnership"), of which Alavi is a 60% owner.[1]

First, we identify material issues of fact as to whether the Alavi Foundation knew that Assa Corporation, its partner in the 650 Fifth Ave. Co. Partnership, continued after 1995, to be owned or controlled by Bank Melli Iran, which is itself owned or controlled by the Government of Iran, a designated threat to this nation's national security.  *See* Exec. Order No. 12,957, 60 Fed. Reg. 14615 (Mar. 15, 1995).  Accordingly, we vacate summary judgment and remand the case for trial as to the Alavi Foundation and 650 Fifth Ave. Co.[2]

---

[1] The Alavi Foundation and 650 Fifth Ave. Co. were the only claimants to request and secure entry of final judgment in this case and, thus, are the only appellants on this appeal.  Accordingly, we henceforth use "Claimants" to refer only to the Alavi Foundation and the 650 Fifth Avenue Company.

[2] Although Assa Corporation is also a claimant whose property interests—including its 40% interest in 650 Fifth Ave. Co.—were forfeited pursuant to the challenged summary judgment, it is not a party to this appeal and the material issue we here identify relates only to Alavi.  Thus, our decision today does not disturb the judgment and forfeiture order as they relate to Assa.

Second, we conclude that the District Court erred in *sua sponte* considering and rejecting the Claimants' possible statute of limitations defense without affording notice and a reasonable time to respond. Thus, we vacate that part of the judgment without prejudice for reconsideration on proper notice and hearing.

Third, in rejecting the Claimants' motion to suppress evidence seized pursuant to a challenged warrant, the District Court erred in ruling that the Claimants' civil discovery obligations "obviate the need for any Fourth Amendment analysis." *In re 650 Fifth Avenue and Related Properties*, 970 F. Supp. 2d 204, 211 (S.D.N.Y. 2013) ("*In re 650 Fifth Ave. Suppression Decision*"). The Fourth Amendment's exclusionary rule applies in civil forfeiture cases, and a party's civil discovery obligations do not automatically render Fourth Amendment rights and remedies inapplicable. We likewise identify error in the District Court's alternative ruling that every item of unlawfully seized evidence would have been inevitably discovered. While discovery obligations might shield unlawfully seized items from suppression under the inevitable discovery doctrine, *see United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992), such a conclusion requires a district court, "for each particular piece of evidence,

specifically [to] analyze and explain how, if at all, discovery of that piece of

evidence would have been more likely than not inevitable absent the [challenged

search]," *id.* at 862 (internal quotation marks omitted).  Because the record fails to

demonstrate that particularized review, we remand to allow the District Court to

conduct the requisite analysis.  On remand, the Government may also pursue its

argument—raised before the District Court and on appeal—that the good-faith

exception to suppression applies in this case.  *See United States v. Leon*, 468 U.S.

897 (1984).

Accordingly, we vacate the District Court's challenged judgment and

remand the case for further proceedings consistent with this opinion.

## BACKGROUND

"We of course view the record in the light most favorable to [the

Claimants], who [are] appealing from an adverse grant of summary judgment."

*Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 211 (2d Cir. 2002); *accord*

*Cortes v. MTA New York City Transit*, 802 F.3d 226, 228 (2d Cir. 2015).[3]

---

[3] On appeal, Claimants broadly assert that, in ruling on the summary judgment
motions, the "District Court relied on evidence whose admissibility and authenticity
had been challenged and not properly ruled on."  Claimants Br. 83–85.  *See Porter v.
Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) ("Only admissible evidence need be
considered by the trial court in ruling on a motion for summary judgment, and a district
court deciding a summary judgment motion has broad discretion in choosing whether

11

## I. The Alavi Foundation

The Alavi Foundation traces its origins to 1973, when the Shah of Iran, Mohammad Reza Pahlavi, incorporated the eponymous Pahlavi Foundation as a New York not-for-profit corporation, and endowed it with several million dollars. The Pahlavi Foundation's stated mission was, *inter alia*, "[t]o render support and assistance for the study and promotion of the arts and sciences" and to support "established charitable, philanthropic, educational and civic endeavors." App'x 5971–72. In 1974, the Pahlavi Foundation acquired property at 650 Fifth Avenue in New York City ("the Property"). In 1975, at the direction of the Shah, Bank Melli—a bank wholly owned by the Iranian government— loaned the Pahlavi Foundation $42 million, thus providing the Foundation with

---

to admit evidence." (internal quotation marks and alterations omitted)). In fact, the District Court here rejected all three of Claimants' evidentiary objections, ruling (1) as to proffered statements in Farsi unaccompanied by a certified translation that "[t]here can be no serious dispute that a certified translation could be obtained," (2) Claimants' hearsay challenge failed on the merits, and (3) that at trial, the parties could either stipulate to documents' authenticity or they could be authenticated by FBI Agent Jennifer McReynolds, the investigation's evidence custodian. *In re 650 Fifth Ave.*, No. 08 CIV. 10934(KBF), 2013 WL 5178677, at *4–5 & n.18 (S.D.N.Y. Sept. 16, 2013) ("*In re 650 Fifth Ave. Summary Judgment Decision*"). We identify no abuse of discretion in these evidentiary rulings.

funds to construct a 36-story office tower on the Property, *i.e.*, the Building, and Bank Melli with two mortgages on that Property.[4]

Following the 1979 Iranian Revolution, which deposed the Shah, Iran's new Supreme Leader, Ayatollah Ruhollah Khomeini, ordered the formation of the Bonyad Mostazafan, an entity charged with managing property expropriated by the revolutionary government, including that at 650 Fifth Avenue. In 1980, the Pahlavi Foundation was renamed the Mostazafan Foundation of New York. The Foundation took on its present name in 1992.[5]

Since its inception, Alavi has purchased and maintained several properties in the United States. In addition to the Building, Alavi acquired seven real properties in the 1980s and 1990s, including two parcels of land in Rockville, Maryland, one property in Houston, Texas, one property in Carmichael, California, two parcels of land in Prince William County, Virginia, and one block of lots in Queens, New York (collectively, "Alavi Real Properties").

---

[4] Bank Melli first loaned the Pahlavi Foundation $30 million pursuant to an agreement executed on July 28, 1975, and subsequently provided an additional $12 million loan pursuant to an October 2, 1975 agreement.

[5] For ease of reference only, we refer to all three iterations of the foundation as "Alavi" throughout the remainder of this opinion.

Alavi's bylaws state that its Board controls the organization's affairs and property and appoints corporate officers and directors, while its President supervises operations and reports to the Board. The bylaws make Alavi's Board and President responsible for, *inter alia*, operational decisions such as charitable efforts, personnel decisions, and program management. Consistent with New York not-for-profit law, *see* N.Y. NOT-FOR-PROFIT CORP. LAW §§ 501, 601 (McKinney 2016), Alavi has never had formal owners, members, or shareholders. The record reflects that Alavi remains a not-for-profit corporation in "good standing," and New York regulatory authorities have never sought to dissolve or remove the organization's corporate status, or taken any action against Alavi, its directors, officers, or employees.

## II. The 650 Fifth Avenue Company

650 Fifth Ave. Co. is a partnership created under New York law in 1989 as part of a plan to relieve Alavi of certain tax obligations. Although Alavi has always been a tax-exempt not-for-profit organization, as a result of Bank Melli's 1975 mortgages on the Property, rental income from the Building was taxable as debt-financed unrelated business income. As explained by the Iranian Deputy Prime Minister (and then-head of the Bonyad Mostazafan) in a July 25, 1987 letter

14

to the Prime Minister, "one of the major problems of the New York Mostazafan Foundation stem[med] from the debt it owe[d] to the New York branch of Melli Bank" because the resulting tax obligations left insufficient funds for the Foundation to provide $1.5 million in services as required by its articles of association. Supp. App'x 285. Thus, Alavi, together with the Government of Iran, the Bonyad Mostazafan, and, ultimately, Bank Melli, sought to eliminate the tax obligation.

In his July 25, 1987 letter, the Deputy Prime Minister proposed a series of transactions that would allow Alavi to pay off the Bank Melli debt using money from the Government of Iran. First, he proposed creating "Company A" in New York and transferring to it both ownership of the Building and the Bank Melli loan. Second, he proposed establishing "Company B" in Europe "with anonymous shares." Supp. App'x. 287. Third, he proposed allocating $45 million to the Bonyad Mostazafan, which would then loan the sum to Company B to purchase 40% of Company A's stock from Alavi. These transactions would thereby permit permitting Alavi to pay off the Bank Melli loans. This plan was to be executed in 1988 but when that failed to occur, apparently due to Bank Melli's failure timely to "resolv[e] the issue of a partnership in the Foundation's

15

building," App'x 6907, Alavi and the Bonyad Mostazafan began considering alternatives.

In May 1989, Seyed Mohammad Badr Taleh ("Badr"), then Alavi's Managing Director, met with representatives of the Bonyad Mostazafan and Bank Melli. Meeting minutes reveal that the participants agreed substantially to carry out the 1987 plan by forming a company "[o]n behalf of Bank Melli" that would "make partnership with" Alavi in order to alleviate Alavi's tax obligations. App'x 6913; *see also* App'x 8694 (minutes from 1992 meeting between Alavi and Bank Melli explaining that Melli entered into 1989 Partnership with Alavi "to save the Foundation and prevent it from paying $3 million in annual taxes"). To accomplish this partnership, Bank Melli would "establish a Company in Jersey Island," and "the established company via other Company will participate with the NY Foundation." App'x 6913.

In light of these tax concerns and the agreed solution, the "Company in Jersey Island" was formed as Assa Company Limited ("Assa Limited") in 1989, which then and to this day wholly owns the "other Company" incorporated in New York, Assa Corporation (together, "Assa"). The understanding, as evident from a 1989 letter in which an Assistant Director of the Bonyad Mostazafan

16

explained the Assa-Alavi partnership, was that "Assa . . . belong[ed] to Bank Melli."  App'x 6918–19.  Indeed, Assa was the vehicle by which Bank Melli carried out the series of circular transactions that effectively relieved Alavi of its tax obligations without surrendering Melli's interests in Alavi income.  As explained in Bank Melli correspondence, Bank Melli financed Assa Limited, Assa Corporation purchased a 35% share in the 650 Fifth Ave. Co. Partnership from Alavi, and Alavi used the funds to pay off the Bank Melli mortgages.  *See* App'x 6923–24.  Pursuant to the 1989 partnership agreement, Alavi contributed the Building, then valued at approximately $128 million, to the newly formed 650 Fifth Ave. Co., while Assa contributed $44.8 million in cash, which Assa had received from Bank Melli and which Alavi returned to Bank Melli as payment for its mortgage debt.[6]

In October 1989, Alavi and Assa formed a partnership under New York law known as the 650 Fifth Ave. Co.  In securing the requisite leave of the New

---

[6] Although the agreement indicates that $128 million represented the "fair market value" of the Building at that time, App'x 6242, other record evidence indicates that the Building's value was calculated so that Assa's (and, therefore, Bank Melli's) 35% partnership interest would be equivalent to the outstanding debt Alavi owed to Bank Melli, *see* App'x 6918 (Bonyad Mostazafan correspondence explaining that although Building was valued at $130 million, that value made Bank Melli's 35% share in Partnership worth $45.5 million while debt Alavi owed to Bank Melli was $45 million, and, because Bank Melli could not "come up with the $500,000 difference," value of the Building was "set . . . at $128 million").

York Supreme Court for a transaction divesting all, or substantially all, assets of a non-profit organization, *see* N.Y. NOT-FOR-PROFIT CORP. LAW §§ 510(a)(3), 511 (McKinney 1989), Alavi's then-president Badr stated in a verified petition that Assa Corporation was owned by Assa Limited, which was in turn "beneficially owned by two individuals, Mr. Mohammad Behdadfar and Mr. Mohsen Kakavand," and that the formation of the Alavi-Assa partnership "represent[ed] an arms-length transaction." App'x 6152. The filing explained that the 650 Fifth Ave. Co. partnership was formed to resolve Alavi's tax liability arising from the Building's rental income, which had been taxable as unrelated business income. App'x 6152–52. No mention was made of Bank Melli's relationship to Assa.

Based on their initial contributions, Alavi received a 65% interest and Assa received a 35% interest in 650 Fifth Ave. Co. Alavi later sold a further 5% to Assa; Alavi now holds 60% of the interest in the Partnership, while Assa holds 40%. Based on their ownership interests, Alavi and Assa received *pro rata* distributions of 650 Fifth Ave. Co.'s income from the Building. Between 2002 and 2004, the Building generated approximately $17 million in annual revenues. Between 2006 and 2009, the Building generated between $19 million and $21 million in annual revenues. Thus, through the circular transactions just

18

discussed, instead of Alavi owing a mortgage debt of approximately $45 million

to Bank Melli, Bank Melli owned 35% (and, later, 40%) of the Building, initially

valued at $44.8 million, and received a commensurate share of that Building's

substantial—and now tax-free—rental income.  Since the Partnership's founding

and until commencement of these forfeiture proceedings, Alavi served as 650

Fifth Ave. Co.'s managing partner, administering the day-to-day affairs of the

Partnership, including management of the Building.

## III.  Iran's Involvement with Alavi, Assa, and 650 Fifth Ave. Co. Before 1995

As the preceding section shows, there is ample evidence of Bank Melli's

involvement with Alavi, Assa, and 650 Fifth Ave. Co. before 1995.  *See, e.g.*,

App'x 6918 (Bonyad Mostazafan correspondence explaining that the partnership

between Alavi and Assa "is based on prior agreements between the Ministry of

Finance, Bank Melli Iran, and" Bonyad Mostazafan); App'x 6923–24 (Bank Melli

correspondence explaining that structure of Assa entities was based on "ample

study at the New York Foundation, the Central Office of the Foundation, and

Bank Melli in Tehran").  Record evidence further shows that after Assa's

formation and prior to 1995, Bank Melli and Assa maintained a close—and at

times inseparable—relationship.  Indeed, Bank Melli had a substantial ownership

19

interest in Assa from its founding through 1995. From 1990 until 1992, two Bank Melli officials indirectly held approximately 96% of Assa's total shares through another straw entity, Harter Holdings Ltd. ("Harter Holdings"), split equally. In 1993, the officials' shares were transferred to Bank Melli Iran, which then held the 96% indirect interest in Assa until 1995.[7]

Record evidence indicates that Bank Melli sought to conceal its ownership of Assa through these arrangements. *See* App'x 7094 (Bank Melli correspondence dated December 29, 1993 explaining that Bank Melli took over ownership of Assa Limited and Harter Holdings because, with Channel Islands incorporation, "accessing the ownership backgrounds of the companies behind the captioned corporation is not an easy task for investigators," and questioning "whether Mr. Naghshineh – the Assa Corp New York Director whose affiliation with the Bank could be easily proven – could be replaced with another individual whose affiliation with the Bank could not be easily proven"); App'x 7103 (Bank Melli correspondence dated June 25, 1994 discussing risk of seizure of "elements

---

[7] Specifically, from 1989–1998, Harter Holdings held 98% of Assa Limited's shares. From 1990–1992, between the two Bank Melli officials, each held 49% of Harter Holdings' shares and, thereby, 96% of Assa Limited. From 1993–1995, Bank Melli Iran held this 98% interest in Harter Holdings, and indirect interest in Assa Limited. As discussed *infra*, sometime in 1995, Shakeri and Aghamiri took over that interest and held it until 1998.

connected to the Islamic Republic of Iran's assets in the United States," and asking its New York office to estimate "percentage of risk of the seizure of . . . properties in case of the revelation of the ownership by Assa Corporation").

Several letters between Alavi and Bank Melli officials also indicate that they viewed Assa as interchangeable with Bank Melli before 1995. Moreover, in 1992, representatives for Alavi and Bank Melli met in Tehran to discuss 650 Fifth Ave. Co.'s need for a $1.7 million loan. Meeting minutes reflect that Bank Melli's representative confirmed Bank Melli's commitment to stand by Alavi and to approve the loan if Alavi adopted a specific plan to pay the debt it owed to Assa.

Record evidence also indicates that, in addition to Bank Melli, other Iranian government officials exercised some control over Alavi and 650 Fifth Ave. Co.'s affairs before 1995. From approximately 1982 to 1991, a Bonyad Mostazafan employee, Seyed Mojtaba Hesami-Kiche, sat on Alavi's Board and, every three months, provided reports about Alavi to the Prime Minister of Iran or the head of the Bonyad Mostazafan.[8] Moreover, minutes from a 1991 meeting in Zurich, Switzerland indicate that Alavi's Board of Directors made changes in the Board's composition "as directed by the Supreme Leader" of Iran, ostensibly

[8] According to Hesami-Kiche, he was employed by the Bonyad Mostazafan from approximately 1980 to approximately 1984 or 1985, at which time he began working for a German company owned by the Bonyad Mostazafan.

referring to the Ayatollah.  App'x 8647.  In a subsequent 1991 letter to the Ayatollah, Alavi's Managing Director, Badr, expressed concern that Iran's Ambassador to the United Nations would exercise a "position of responsibility connected to [Alavi's] affairs" going forward.  App'x 8674.  In a subsequent letter to an individual named Sobhani, Badr stated that, as a result of "inadvisable actions" taken by former executive directors of Alavi and Iran's Ambassador, "both the Foundation and the assets of Bank Melli will face obliteration."  App'x 8663.  That letter further explained that if the connection between Alavi and the Government of Iran were discovered, board members, including Hesami-Kiche, could "be culpable of a heavy offence."  App'x 8662–64.

## IV. Sanctions Against Iran

In March 1995—six years after 650 Fifth Ave. Co.'s formation—President Clinton issued a series of Executive Orders pursuant to the International Emergency Economic Powers Act ("IEEPA"), formally declaring the Government of Iran a threat to national security and imposing broad financial sanctions.  *See* Exec. Order No. 12,957, 60 Fed. Reg. 14615 (Mar. 15, 1995); Exec. Order No. 12,959, 60 Fed. Reg. 24757 (May 6, 1995).  Those Executive Orders authorized the

22

Secretary of the Treasury, in consultation with the Secretary of State, to promulgate rules and regulations to implement the financial sanctions.

Pursuant to that authority, the Treasury Department's Office of Foreign Assets Control ("OFAC") determined that Bank Melli was owned or controlled by the Government of Iran, thus subjecting it to, among other things, limitations on the receipt of services from U.S. financial institutions beginning June 6, 1995, except as authorized by an OFAC license. *See* Implementation of Executive Order No. 12959 With Respect to Iran, 60 Fed. Reg. 40881-02 (Aug. 10, 1995). OFAC also subsequently promulgated a series of Iranian Transactions Regulations ("ITRs") relevant to this action, which took effect on August 20, 1997, and which generally prohibit United States entities from conducting business with or providing services to the "Government of Iran." The "Government of Iran" is defined in the ITRs as "[t]he state and the Government of Iran, as well as any political subdivision, agency, or instrumentality thereof," "[a]ny person owned or controlled, directly or indirectly, by the foregoing," and "[a]ny person . . . acting or purporting to act, directly or indirectly, for or on behalf of the foregoing." 31 C.F.R. § 560.304 (2012); *see id.* §§ 560.203, 560.204, 560.207, 560.208, 560.301. Alavi and 650 Fifth Ave. Co. are United States entities

23

subject to these orders and regulations and prohibited thereby from conducting

business with or providing services to Bank Melli or any other instrumentality

owned or controlled by, or acting on behalf of, the Government of Iran.[9]

## V.    Bank Melli's Relationship with 650 Fifth Ave. Co. After 1995

In 1995, after the first of the relevant Executive Orders imposing sanctions

on Iran was issued, Bank Melli formally divested its ownership of Assa.  Bank

Melli's Harter Holdings shares were acquired by two individuals, Davood

Shakeri and Fatemeh Aghamiri.  Together, Shakeri and Aghamiri indirectly held

100% of Assa's shares until 1999, when they directly acquired 100% of Assa's 100

shares.[10]  Proffered records indicate that Shakeri and Aghamiri acquired their

---

[9] On January 16, 2016, President Obama issued Executive Order 13,716 in connection with the "Implementation Day" of the Joint Comprehensive Plan of Action ("JCPOA") related to Iran's nuclear program.  *See* Exec. Order No. 13,716, 81 Fed. Reg. 3693 (Jan. 16, 2016).  The order revoked or amended certain executive orders concerning Iranian sanctions, but kept in place President Clinton's declaration of a national emergency vis-à-vis Iran two decades ago.  *Id*.  Consistent with certain Implementation Day commitments, OFAC has also submitted final rules partially amending the ITRs.  *See* 81 Fed. Reg. 3330 (Jan. 21, 2016) (to be codified at 31 C.F.R. pt. 560).  For further discussion of the JCPOA, *see Kirschenbaum, et al. v. 650 Fifth Avenue Company and Related Properties* ("*Kirschenbaum*"), 14-1963 at 22–23.

[10] Unauthenticated corporate records from the United Kingdom's Jersey Island purport to show that from 1996–1998, Shakeri and Aghamiri held 50% interests in Harter Holdings, which owned 98% of Assa Limited's total shares, and 1% each of Assa Limited's shares.  In 1999, Harter Holdings divested its interests and Shakeri and Aghamiri became 100% direct owners of Assa Limited.  Although the admissibility of

24

shares in Harter Holdings and in Assa for £1/share.[11]  App'x 10319, 10325, 10361.

Shakeri and Aghamiri directly held 100% of Assa's shares until 2008.[12]

In support of its claim that Bank Melli nevertheless continued to exercise control over Assa after 1995, the Government primarily relied on two categories of evidence:  (1) emails from Hassan Dehghani Tafti ("Tafti"), Assa's sole representative in the United States ("Tafti emails") and (2) notes purportedly from a 2007 meeting between Alavi's new President, Farshid Jahedi ("Jahedi"), and Iran's Ambassador to the United Nations, Mohammad Khazaee ("Khazaee") ("Khazaee–Jahedi meeting").

## A. Tafti Emails

In 2005, Tafti sent three emails to Mohsen Ghadimipour, then head of Bank Melli's Overseas Network Supervisory Department ("ONSD").  First, in February 2005, Tafti requested, *inter alia*, that ONSD provide him with "the signature of

---

these records is subject to question for reasons discussed *infra* at 46–48, on this appeal we assume authentication—and admissibility—will be satisfied on remand.

[11] The records show that, as of January 1, 1996, Shakeri and Aghamiri each owned (1) one share of Assa Limited, and that the "[a]mount paid on each share (par value)" was £1, App'x 10319; and (2) 50 shares of Harter Holdings, and that the "amount paid on each share (par value)" for those shares was similarly £1, App'x 10361.  When Shakeri and Aghamiri acquired all Assa Limited shares in 1998, the amount paid on each share was again listed as £1.  *See* App'x 10325.

[12] The record contains no information regarding the ownership of Assa Limited after 2008, when the Government initiated this forfeiture action.

the [Assa] share holders, Mrs. Aghamiri and Mr. Shakeri." App'x 7156. Second, in July 2005, Tafti advised Ghadimipour that the "share holders are forbidden from having residences [in Iran], and as per the view of the legal experts, [the United States] may freeze the capital of the share holders." App'x 7129. Tafti requested that ONSD make "some arrangement that the residence location of the share holders of Assa, Mr. Davood Shakeri and Mrs. Aghamiri be changed to another country." App'x 7129. Finally, also in July 2005, Tafti wrote Ghadimipour that "[c]hanging the share holder of Assa Ltd. is possible, but the share holder should reside in a [tax free country]. . . . Otherwise, the country of residence will collect a tax from the income of the share holder." App'x 7134. The Government argues that these communications show that Assa's post-1995 record owners were only fronts for Bank Melli, which continued to control Assa's holdings in 650 Fifth Ave. Co. The August 2005 response Tafti received is further evidence of Bank Melli's control: "With reference to the email of 7/7/2005, regarding the location of residence of the shareholders, this is to inform you that, *as per the orders of the Bank Manager*, until the appointment of the qualified individuals, act as before." App'x 7143 (emphasis added). Although this email and three others in the record indicate that they were sent by (or, in some, from

26

Tafti to) the "shareholders of Assa," each bore the same email address—

"ONSD_ir@yahoo.com"—used on several of the Ghadimipour emails, *see, e.g.*,

App'x 7134, 7143, 7152, 10401, 10404.

### B. Khazaee–Jahedi Meeting

In 2007, certain Alavi board members and President Jahedi met with

Ambassador Khazaee at the Ambassador's residence. The record does not

indicate the purpose of the meeting, how it was arranged, or what, if any, action

was taken as a result of the meeting. The Government nevertheless maintains

that two sets of meeting notes support its contention that Khazaee instructed

Jahedi with respect to the management of Alavi.

The first set of notes, dated October 5, 2007, bears the heading "Board

Meeting," references "Khazaee" and "Jahedi," and includes, *inter alia*, the

following statements: "[s]hould only allocate to Shiites," App'x 8720; "ASSA:

Daily expenses? Payments? Investment policy?," App'x 8711, 8721; "The

composition of the Board of Trustees = Whatever I decide should be approved

and it should not be otherwise," App'x 8722; and "I have to <u>definitely</u> see the

proposed allocations before a final decision is reached. I have to be kept

informed and I have to be able to state my opinion in order for you to make a

decision," App'x 8724 (emphasis in original). Although the authorship of these notes is unknown, the Government submits that their content supports an inference that they were taken by Alavi's President Jahedi and that the speaker referenced therein is Khazaee.

The second set of notes is from the journal of Alavi's secretary, Alireza Ebrahimi ("Ebrahimi") and references dates that do not match the purported October 2007 meeting: shortly after the heading "Mr. Alireza Ebrahimi's Journal, Summer 2003" are three other dates, Friday, July 25, Sunday, July 27, and Sunday, August 10. App'x 7109. These notes contain stray statements that may indicate a desire to sell Bank Melli's share in Assa. One statement reads, "Dr. Kharrazi → Assa share → Sell it," App'x 7109, and another reads, "Mr. Zarif → Assa → Bank Melli 40% share → I cannot sleep at night → The issue of Board of Trustees will be solved, When? → Transfer," App'x 7110.

## VI. Procedural History

### A. The Initial Civil Forfeiture Complaint

On December 17, 2008, the United States filed this civil action in the Southern District of New York seeking forfeiture of property owned by Assa and Bank Melli based on violations of the IEEPA, 50 U.S.C. § 1701 *et seq.*, and 18

28

U.S.C. §§ 1956, 1957. Simultaneously, the Treasury Department added Assa to the Specially Designated Nationals ("SDN") list based on its determination that Assa is a front company for Bank Melli.[13] Although the initial complaint recounted the history of Alavi and 650 Fifth Ave. Co., it did not seek forfeiture of either entity's property. That same day, however, District Judge Holwell entered a protective order prohibiting, *inter alia*, "[a]ll persons and entities having actual knowledge" of the order, which included Alavi and 650 Fifth Ave. Co., from "destroy[ing] any documents relating in any manner or part to the allegations in the Complaint, including but not limited to the books and records of the Fifth Avenue Company, the Pahlavi Foundation, the Mostazafan Foundation, the Alavi Foundation, Assa Corporation, Assa Company Ltd., and/or Bank Melli." App'x 5185. In addition to the preservation requirements, the order required 650 Fifth Ave. Co.—but not Alavi—to make its "books and records" "available for inspection to the United States." App'x 5186.

---

[13] *See* Dep't of Treasury, Press Release, Treasury Designates Bank Melli Front Company in New York City, http://www.treasury.gov/press-center/press-releases/Pages/hp1330.aspx (last visited June 21, 2016) (explaining "scheme to use a front company set up by Bank Melli – a known proliferator [of weapons of mass destruction] – to funnel money from the United States to Iran" (internal quotation marks omitted)). In January 2016, the United States lifted nuclear-related sanctions previously imposed on Iran and removed various entities subject to those sanctions from the SDN List, including Bank Melli and Assa. For a more comprehensive discussion of this action, *see Kirschenbaum*, 14-1963 at 22–23, 66–67.

**B. The Separate Criminal Investigation**

Also on December 17, 2008, the Government served a grand jury subpoena on Alavi, seeking evidence of IEEPA violations and money laundering. The Government sought "any and all documents relating or referring to" the 650 Fifth Ave. Co., Assa, and Bank Melli Iran, "from January 1, 1989 to the present." App'x 5192–93. The subpoena was served on Alavi President Jahedi. The following day, agents of the Federal Bureau of Investigation ("FBI") observed Jahedi throwing papers responsive to the subpoena into a public trash bin. Jahedi subsequently pled guilty to obstruction of justice for these actions and was sentenced to three months' imprisonment. Judgment, *United States v. Jahedi*, No. 1:09-cr-00460-SAS (S.D.N.Y. Apr. 30, 2010), ECF No. 52; *see also United States v. Jahedi*, 681 F. Supp. 2d 430 (S.D.N.Y. 2009). The FBI ultimately retrieved the documents discarded by Jahedi. Although the Government submitted photographs of the torn documents in connection with its opposition to Claimants' motion to suppress, the documents themselves were not submitted by the Government in support of its motion for summary judgment as to the forfeitability of the Defendant Properties.

## C. The Criminal Search Warrant

On December 19, 2008, the day after Jahedi's attempted destruction of documents, the FBI sought, obtained, and executed a criminal search warrant for the offices of Alavi and 650 Fifth Ave. Co. Magistrate Judge Theodore Katz issued the two-page warrant, which referenced supporting "[a]ffidavit(s) . . . made before me by Special Agent George Ennis that he has reason to believe that [listed property] is now being concealed" at the addresses specified to be searched. App'x 5140. In boilerplate language, the warrant stated that the magistrate judge was "satisfied that there is probable cause to believe that the property so described is being concealed" on the premises and that "the grounds for application for issuance of the search warrant exist as stated in the supporting affidavit(s)." App'x 5140. It then authorized the FBI to search and seize:

1. Any and all . . . documents or records concerning or relating to the ownership of, rental of, mortgaging of, or investing in [Assa, 650 Fifth Ave. Co., or Bank Melli Iran.]

2. Any and all documents concerning or relating to financial books and records, bank accounts, disbursements, money transfers or employment records of [Assa, 650 Fifth Ave. Co., Alavi, or Bank Melli Iran] or any of the officers and employees of these entities.

3. Any and all computers; central processing units; external and internal drives; external and internal storage equipment or media; computerized data storage devices; hard disks or floppy

31

disks; CD-ROMs[;] . . . and related or connected computer or data storage equipment.

App'x 5141. The warrant does not identify the crimes for which agents were authorized to search or seize the listed property. Nor does the warrant place any temporal limit on the property to be seized.

The twelve-paragraph Ennis affidavit supporting the warrant described the history of Alavi, including the tax issue that led to the formation of 650 Fifth Ave. Co. Moreover, unlike the search warrant, the Ennis affidavit stated that the property sought constituted evidence of, among other crimes, violations of the IEEPA, the ITRs, and 18 U.S.C. §§ 1956, 1957. It explained as follows:

> In 1999, [OFAC] identified Bank Melli and its offices worldwide as entities "owned or controlled by the Government of Iran." 31 C.F.R. Part 560, App. A. Accordingly, Bank Melli is subject to the Iranian Transactions Regulations ("ITR"), Title 31 United States Code of Federal Regulations, Part 560, and Assa Co.'s interest in the Building and its rents is subject to civil forfeiture, as fully set forth in [the attached December 17, 2008 civil Complaint] . . . .
>
> [A]lthough the property and funds which are subject to forfeiture belong to Bank Melli and its related entities, the transactions underlying Bank Melli's acquisition of its interest in the Building [were] not an arms-length transaction with Alavi, but rather [were] structure[d] both to evade Alavi's tax liability and to conceal Bank Melli's interest in the Building. Accordingly, I submit

32

that there is probable cause to believe that Alavi committed the same crimes alleged as a basis for the forfeiture sought in [the original Complaint], and that Alavi and its directors, employees, and other agents, committed, conspired to commit, and aided and abetted the same violations by Alavi and Bank Melli, among others.

App'x 5145–46.

The warrant was executed on Claimants' offices the day it was obtained. The FBI seized nearly all computers, servers, and electronic storage devices found therein, along with over two hundred boxes of papers, records, and other tangible materials, some documents dating back thirty years.

### D. The Amended Civil Forfeiture Complaint

Almost a year after the search of Claimants' offices, on November 12, 2009, the Government filed an amended civil forfeiture complaint, adding Alavi's and 650 Fifth Ave. Co.'s properties as defendants-in-rem. In total, the Government sought forfeiture of "[a]ll right, title, and interest" of (1) Alavi, 650 Fifth Ave. Co., Assa, and Bank Melli Iran, and all property traceable thereto, (2) the Building, including all improvements and attachments, and all property traceable thereto, (3) the Alavi Real Properties, with all improvements and attachments thereon, and (4) the contents of nine bank accounts, and all funds traceable thereto. The

Government asserted that the Defendant Properties are forfeitable (1) as proceeds of violations of the IEEPA and certain ITRs issued by the Department of the Treasury,[14] and (2) as proceeds traceable to property involved in money laundering.  The parties engaged in discovery for nearly four years thereafter.

### E.  Judgment Creditor Actions

Soon after the Government filed its initial forfeiture complaint, various plaintiff groups began to file actions against Assa, Alavi, and 650 Fifth Ave. Co., seeking attachment and turnover of Defendants' properties to satisfy judgments obtained against Iran under the Foreign Sovereign Immunities Act ("FSIA") for acts of terrorism.  Those judgment creditor actions generally allege that Assa, Alavi, and 650 Fifth Ave. Co. are sufficiently related to Iran to render their property subject to turnover pursuant to the FSIA, *see* 28 U.S.C. §§ 1610(a), (g), and the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107–297, 116 Stat. 2322, 2337 (codified at 28 U.S.C. § 1610 note).  Although not at issue in the instant appeal, these judgment creditor actions are here relevant to the extent

---

[14] As discussed *infra* at 39, the IEEPA imposes both civil and criminal penalties for the violation of "any license, order, regulation or prohibition issued under" the IEEPA, 50 U.S.C. § 1705, and property derived from proceeds traceable to an offense under § 1705 is subject to forfeiture, *see* 18 U.S.C. § 981(a)(1)(C).

that, before the District Court, they were consolidated with the civil forfeiture action for purposes of pre-trial motions and, if necessary, trial.[15]

### F. The District Court's Judgments

Since its commencement in 2008, this forfeiture action has generated numerous decisions by the District Court. As relevant here, on September 9, 2013, the District Court denied Alavi's and 650 Fifth Ave. Co.'s motion to suppress evidence seized during the December 2008 search, which they alleged violated their Fourth Amendment rights. *See In re 650 Fifth Ave. Suppression Decision*, 970 F. Supp. 2d 204.[16] On September 16, 2013, the District Court granted summary judgment in favor of the United States, forfeiting all of Assa's, Alavi's, and 650 Fifth Ave. Co.'s interests in the Defendant Properties, with the exception of the Alavi Real Properties and three Alavi-only bank accounts. *In re 650 Fifth Avenue and Related Properties*, No. 08 CIV. 10934(KBF), 2013 WL 5178677, at *3 (S.D.N.Y. Sept. 16, 2013) ("*In re 650 Fifth Ave. Summary Judgment Decision*"). In

---

[15] The summary judgment entered in favor of these creditors is also before this panel and, although not consolidated with appeal of the forfeiture judgment, we heard oral argument on the two actions in tandem given their factual overlap. We dispose of the appeal in the judgment creditor action in a separate opinion also filed this day, *see Kirschenbaum*, 14-1963.

[16] Though they were parties below, Assa Corporation and Assa Limited did not join Alavi's and 650 Fifth Ave. Co.'s motion to suppress, and we express no view as to whether they would have had standing to do so.

35

granting summary judgment, the District Court *sua sponte* raised and rejected the Claimants' possible statute of limitations defense. *Id.* at *36–38. On April 18, 2014, the District Court granted summary judgment to the Government as to the Alavi Real Properties and three Alavi-only bank accounts. *In re 650 Fifth Avenue and Related Properties*, No. 08 CIV. 10934(KBF), 2014 WL 1516328, at *21–31 (S.D.N.Y. Apr. 18, 2014). Finally, on May 28, 2014, at Alavi's and 650 Fifth Ave. Co.'s request, the District Court entered final judgment as to the Government's claims of forfeiture against these Claimants' properties. *See* Fed. R. Civ. P. 54(b) (permitting entry of final judgment as to "fewer than all . . . claims or parties" upon finding of "no just reason for delay"); *see* Order, *In re 650 Fifth Avenue and Related Properties*, No. 08 Civ. 10934(KBF) (May 27, 2014), ECF No. 1151; Rule 54(b) Judgment, *In re 650 Fifth Avenue and Related Properties* (May 28, 2014), ECF No. 1152.[17] Alavi and 650 Fifth Ave. Co. timely appealed, challenging the final summary forfeiture judgment of their interests in the Defendant Properties, and the denial of their motion to suppress.

---

[17] Although the District Court also awarded the Government summary judgment with respect to Assa's interest in the Defendant Properties, Assa did not seek a Rule 54(b) final judgment and, thus, that portion of the District Court's summary judgment order is not before us on this appeal.

## DISCUSSION

## I.   The Government's Forfeiture Claims

We review a district court's grant of summary judgment *de novo*, and will affirm only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Vincent v. Money Store*, 736 F.3d 88, 96 (2d Cir. 2013). In determining whether there is a genuine dispute as to a material fact, we "resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party." *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 620 (2d Cir. 2016).

In civil forfeiture proceedings, the Government bears the burden of showing by a preponderance of the evidence that the property at issue is subject to forfeiture. 18 U.S.C. § 983(c); *accord United States v. Sum of $185,336.07 United States Currency*, 731 F.3d 189, 196 (2d Cir. 2013). To carry this burden it must show that the property is more likely than not forfeitable. *See United States v. Funds in the Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 716 n.5 (7th Cir. 2013) (explaining in civil forfeiture action that preponderance standard requires showing that property is more likely than not subject to forfeiture); *cf. United States v. Coppola*, 671 F.3d 220, 250

(2d Cir. 2012) (stating that "preponderance finding satisfied if fact's existence was 'more likely than not'" (quoting *United States v. Hertular*, 562 F.3d 433, 447 (2d Cir. 2009)). Upon such a showing, the burden then shifts to the claimant to show a triable issue as to whether it was an "innocent owner"—*i.e.*, that the claimant had no knowledge of the predicate illegal activity. *See United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d 96, 104 (2d Cir. 2000).

## A. The IEEPA Theory of Forfeiture

The Government's first civil forfeiture claim arises under the IEEPA, a federal statute that empowers the President of the United States to employ economic sanctions and other measures to deal with threats to this nation's security, foreign policy, or economy, which have their source "in whole or substantial part outside the United States," and for which he has declared a national emergency. 50 U.S.C. §§ 1701–1702. The relevant civil forfeiture statute states:

> (a)(1) The following property is subject to forfeiture to the United States: . . .
>
> > (C) Any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

18 U.S.C. § 981(a)(1)(C). Section 1956(c)(7) defines "specified unlawful activity" to include offenses under "section 206 (relating to penalties) of the International Emergency Economic Powers Act." *Id.* § 1956(c)(7)(D). Section 206 of the IEEPA makes it "unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," 50 U.S.C. § 1705(a), and provides for both civil and criminal penalties, *see id.* § 1705(b) (providing civil fine of $250,000 or amount twice transaction on which violation is based); *id.* § 1705(c) (providing for up to 20 years' imprisonment and criminal fine up to $1,000,000). The orders, regulations, and prohibitions referenced in section 206 are set forth in several Executive Orders and related ITRs promulgated by OFAC. This chain of interlocking statutes can thus be summarized as follows: property that "constitutes or is derived from proceeds traceable to" violations of executive orders and ITRs promulgated pursuant to the IEEPA is subject to forfeiture. *See* 18 U.S.C. § 981(a)(1)(C); *id.* § 1956(c)(7)(D); 50 U.S.C. § 1705.

In 1995, President Clinton, acting pursuant to his authority under the IEEPA, issued two executive orders relevant to the present action. Executive Order 12,957 found that "the actions and policies of the Government of Iran

constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declared "a national emergency to deal with that threat."  Exec. Order No. 12,957, 60 Fed. Reg. 14615, 14615 (Mar. 15, 1995).  Executive Order 12,959 imposed broad financial sanctions on Iran, including a prohibition on "the exportation from the United States to Iran, the Government of Iran, or to any entity owned or controlled by the Government of Iran, or the financing of such exportation, of any goods, technology . . . or services."  Exec. Order No. 12,959, 60 Fed. Reg. 24757, 24757 (May 6, 1995).[18]

Pursuant to the IEEPA and Executive Orders 12,957 and 12,959, in September 1995, OFAC promulgated the five ITRs that the Government alleges Alavi and 650 Fifth Ave. Co violated in this case, thereby rendering the Defendant Properties forfeitable under 18 U.S.C. § 981(a)(1)(C) as proceeds traceable to IEEPA violations.  In relevant part, the five ITRs state:

---

[18] Prior to President Clinton's 1995 Orders, President Reagan, acting pursuant to his authority under the International Security and Development Cooperation Act, *see* 22 U.S.C. § 2349aa-9, issued Executive Order 12,613, which stated that "that the Government of Iran is actively supporting terrorism as an instrument of state policy." *See* Exec. Order No. 12,613, 52 Fed Reg. 41940, 41940 (Oct. 29, 1987).  That Executive Order, along with ITRs promulgated by OFAC, prohibited the importation of certain Iranian goods and services into the United States.  *See id.*; 52 Fed. Reg. 44076, 44077 (Nov. 17, 1987).  Because the allegations here charge Claimants with violating only the 1995 Orders and ITRs, we need not discuss these 1987 sanctions further.

(1) (a) Any transaction on or after [October 22, 2012] that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part is prohibited. (b) Any conspiracy formed to violate any of the prohibitions set forth in this part is prohibited. [31 C.F.R. § 560.203 (2012).[19]]

(2) [T]he exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

    (a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran . . . [*Id.* § 560.204 (2012).]

(3) [N]o United States person, wherever located, may engage in any transaction or dealing in or related to:

    (a) Goods or services of Iranian origin or owned or controlled by the Government of Iran;

    (b) Goods, technology, or services for exportation, reexportation, sale or supply, directly or indirectly, to Iran or the Government of Iran. [*Id.* § 560.206.]

---

[19] 31 C.F.R. § 560.203, which was originally issued in 1995, was amended in 2012. As the District Court appropriately found, the revised language does not make a material difference in this case.

(4) [A]ny new investment by a United States person in Iran or in property (including entities) owned or controlled by the Government of Iran is prohibited. [*Id.* § 560.207.]

(5) [N]o United States person, wherever located, may approve, finance, facilitate, or guarantee any transaction by a foreign person where the transaction by that foreign person would be prohibited by this part if performed by a United States person or within the United States. [*Id.* § 560.208.]

With respect to these ITRs, OFAC has defined the "Government of Iran" to include "[a]ny person owned or controlled, directly or indirectly" by "[t]he state and the Government of Iran, as well as any political subdivision, agency, or instrumentality thereof." *Id.* § 560.304. OFAC has further stated that the "term entity owned or controlled by the Government of Iran includes any corporation, partnership, association, or other entity in which the Government of Iran owns a 50 percent or greater interest or a controlling interest, and any entity which is otherwise controlled by that government." *Id.* § 560.313 (2012). It is undisputed that Bank Melli, a bank owned by the Iranian government, is the "Government of Iran" under the ITRs. *See id.*; *see also* Implementation of Executive Order No. 12959 with Respect to Iran, 60 Fed. Reg. 40881-02, 40883 (Aug. 10, 1995) (determining Bank Melli "to be owned or controlled by the Government of Iran").

For the Government to succeed on summary judgment on its forfeiture claim against the Defendant Properties as proceeds of IEEPA violations under the civil forfeiture statute, 18 U.S.C. § 981(a)(1)(C), it must show there is no triable issue that the Defendant Properties (1) either "constitute[] . . . proceeds" or are "derived from proceeds" that are (2) traceable to (3) a violation or a conspiracy to violate the relevant Executive Orders and implementing ITRs. *Id.* § 981(a)(1)(C).

The Government's IEEPA theory of forfeiture can be summarized as follows: the Defendant Properties are forfeitable as proceeds traceable to Alavi's provision of services to its 650 Fifth Ave. Co. partner Assa, which violates the ITRs because Assa is a front for Bank Melli, which is an instrumentality of the Government of Iran.[20]  To demonstrate a violation of any one of the implementing ITRs on this theory, and hence to satisfy step three of the civil forfeiture statute, the Government had to show that no triable issue exists as to whether (1) Assa was owned or controlled by the Government of Iran after 1995, *see* 31 C.F.R. § 560.304; *see also id.* §§ 560.203, 560.204, 560.206, 560.207, 560.208;

---

[20]  The Government does not here argue that the Government of Iran's control of Alavi renders Alavi's property subject to IEEPA forfeiture.  Nor did the Government advance such an argument before the District Court.  Thus, we express no view on that subject.

43

and (2) Alavi provided services to Assa after 1995 knowing it was so owned or controlled.[21]  For the reasons set forth herein, we conclude that the Government carried its burden as to the first requirement, but that triable issues of fact as to the second preclude an award of summary judgment in its favor.[22]  Therefore,

[21] Only one of the implementing ITRs contains an explicit knowledge requirement.  *See* 31 C.F.R. § 560.204 (prohibiting, *inter alia*, the supply of any "services to a person in a third country undertaken with knowledge or reason to know that . . . [s]uch . . . services are intended specifically for supply . . . directly or indirectly, to Iran or the Government of Iran").  Further, although the IEEPA prescribes criminal penalties for the "willful[]" violation of an IEEPA-promulgated regulation, 50 U.S.C. § 1705(c), the civil penalties provision specifies no similar *mens rea* requirement, *see id.* § 1705(b); *Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1150 (9th Cir. 2009) (explaining that IEEPA's civil penalty provision does not have a *mens rea* requirement).  Nevertheless, the District Court determined that knowledge was an element of an IEEPA or ITR violation.  *In re 650 Fifth Ave. Summary Judgment Decision*, 2013 WL 5178677, at *22 (noting that "determining if there is a triable issue of fact as to whether Claimants have violated, attempted to violate, or conspired to violate the IEEPA (and its implementing ITRs) requires inquiry into . . . whether there is a triable issue as to knowledge").  Likewise, on appeal, the Claimants argue, and the Government does not dispute, that to secure forfeiture based on Claimants' violation of IEEPA or the ITRs, the Government had to show that Claimants provided services to Assa after 1995 knowing that the entity continued to be owned and controlled by Bank Melli  and, therefore, by Iran. Thus, we assume without deciding that the challenged summary judgment can be affirmed only if no material questions of fact exist as to Claimants' *knowing* violation of IEEPA-promulgated ITRs.  *See New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 662 (2d Cir. 2015) (explaining that arguments not raised before district court are forfeited on appeal).

[22] In addition to 31 C.F.R. §§ 560.204, 560.206, the District Court determined that Alavi and 650 Fifth Ave. Co. violated 31 C.F.R. § 560.208, which states that no United States person "may approve, finance, facilitate, or guarantee any transaction by a foreign person where the transaction by that foreign person would be prohibited by this part if performed by a United States person or within the United States."  Because we do not

because we identify material questions of disputed fact at the third step of analysis as to Claimants' *mens rea*, we vacate the summary judgment award forfeiting their interests in the Defendant Properties and remand for further proceedings.

### 1. Ownership and Control

Claimants argue that the District Court erred in concluding, as a matter of law, that Bank Melli owned Assa after 1995. In so arguing, they rely on (1) corporate records showing that Bank Melli sold its interest in Assa to Shakeri and Aghamiri in 1995, (2) testimony from a former Bank Melli employee who stated that he understood that Melli was required by U.S. law to divest its ownership in Assa after five years, and (3) testimony from another former Bank Melli employee that he was unaware of any relationship between Melli and Assa after 1995. The argument fails because the records do not show a *bona fide* transfer in that they report only trivial consideration for an entity worth tens of millions of dollars. Further belying a *bona fide* transfer is Bank Melli's strong motive to conceal its continued ownership of Assa after 1995 changes in U.S. law, previous use of straw entities to conceal its ownership interests, and documented

---

identify any underlying violation of 31 C.F.R. § 560.208 on the record before us, summary judgment cannot be affirmed on this ground.

continued involvement with Assa after 1995, while evading inquiries about the straw owners. On this record, even "draw[ing] all reasonable inferences" in Claimants' favor, *Mhany Mgmt., Inc.*, 819 F.3d at 620, the evidence on which they rely is insufficient to raise a genuine issue of material fact as to Bank Melli's post-1995 ownership and control of Assa.

First, assuming the admissibility of the proffered corporate records showing that Bank Melli divested its ownership interest in Assa in 1995, those records do not raise a question of fact precluding summary judgment because they fail to indicate a *bona fide* transaction.[23] Rather, they show that Shakeri and Aghamiri each acquired 50 shares first in Harter Holdings and then in Assa for a total of £50 (£1/share). Given that Assa had assets worth approximately $40 million, that consideration is so trivial as to belie a *bona fide* transfer. *See United*

---

[23] The only corporate records of the 1995 sale were attached as exhibits to (1) a declaration of Shakeri, and (2) a declaration of Claimants' attorney. The first declaration was stricken from the record when Shakeri failed to appear for deposition as ordered by the District Court, *see* Fed. R. Civ. P. 37, and that sanction is not challenged on appeal. As to the second declaration, it is not apparent that Claimants' attorney is competent to authenticate these records. Because the Government did not question authenticity before the District Court, we assume, without deciding, the admissibility of these records at trial. *See Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (explaining that "[o]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment"); *H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454 (2d Cir. 1991) (observing that parties are not required to authenticate documents at summary judgment stage where no challenge to authenticity raised).

*States v. Premises and Real Property with Buildings, Appurtenance and Improvements at 500 Delaware Street, Tonawanda, New York*, 113 F.3d 310, 312 (2d Cir. 1997) ("*500 Delaware Street*") (upholding finding that a father was straw owner of home transferred to him by arrested son for $1 to avoid forfeiture); *United States v. Reckmeyer*, 836 F.2d 200, 208 (4th Cir. 1987) (explaining that third party can avoid forfeiture of property under 21 U.S.C. § 853 by establishing that he is "bona fide purchaser for value," *i.e.*, he gave "value to the defendant in an arms'-length transaction with the expectation that [he] would receive *equivalent value in return*" (emphasis added)).[24]  Even if it is possible that the corporate records do not reflect the true price Shakeri and Aghamiri paid for Assa, such a possibility is necessarily speculative in the absence of any other record evidence of the transfer price.  *See, e.g.*, *DiStiso v. Cook*, 691 F.3d 226, 229–30 (2d Cir. 2012) (explaining that court reviewing motion for summary judgment "cannot credit a [nonmovant's] merely speculative or conclusory assertions").

---

[24] Assa Corporation's 1993 tax return indicates over $44 million in assets and, although the record does not appear to contain Assa's 1994 or 1995 returns, those for 2000 and 2001, similarly indicate assets over $40 million, supporting an inference that Assa's 1995 assets totaled over $40 million.  *See* App'x 10869–71.  Indeed, the conclusion is reinforced by the fact that Assa held a 40% interest in 650 Fifth Ave. Co., whose principal asset, the Building, was valued at $128 million in 1989 and which generated annual rental income of $17 million at that time.

Second, the record shows that Bank Melli had a strong motive in 1995 for concealing its continuing ownership and control of Assa behind straw purchasers. President Clinton's 1995 Executive Orders and related ITRs prohibited United States entities, such as Alavi, from providing services to instrumentalities of the Government of Iran, such as Melli, or entities fronting for it, as Assa had from its creation. *See* Exec. Order No. 12,957, 60 Fed. Reg. 14615 (Mar. 15, 1995); Exec. Order No. 12,959, 60 Fed. Reg. 24757 (May 6, 1995); Iranian Transactions Regulations: Implementation of Executive Orders 12957 and 12959, 60 Fed. Reg. 47061-01 (Sept. 11, 1995). Indeed, soon after the 1995 Orders, OFAC formally identified Bank Melli as owned or controlled by the Government of Iran, *see* Implementation of Executive Order No. 12959, 60 Fed. Reg. 40881-02 (Aug. 10, 1995), thereby making it illegal for Melli to own an interest in 650 Fifth Ave. Co.

Third, even if the 1995 sanctions could admit an inference of true divestiture in order to comply with U.S. law, such an inference is not reasonable here. Not only did the recorded consideration for Bank Melli's Assa holdings not reflect a *bona fide* sale, but record evidence demonstrates that, well before 1995, Bank Melli had concealed its ownership and control of Assa while still profiting

48

from Building-generated income.  In 1989, Bank Melli (on behalf of Iran), created

a chain of straw entities stretching from the Jersey Islands to the United States

(*e.g.*, Assa Corporation, Assa Limited, Harter Holdings, 650 Fifth Ave. Co.) that it

used to effect circular money transfers that allowed Alavi to discharge its

mortgage debt to Melli (and thereby avoid tax obligations on Building income),

while effectively transferring a 35%—subsequently 40%—interest in that

Property and its income to Bank Melli (and thereby to Iran).  Thus, even though

Bank Melli's ownership and control of Assa prior to 1995 appears undisputed,

corporate records show that from 1989 to 1993, Assa's shares were held not

directly by Bank Melli but, through Harter Holdings, by straw owners,

Mohammad Behdadfar, a member of Melli's Board, and Mohsen Kakavand, a

regional manager of Melli's London office.  *See* App'x 6918 (Bonyad Mostazafan

correspondence from 1989 explaining that "Assa . . . belong[ed] to Bank Melli");

App'x 9888 (Bank Melli correspondence explaining that "transfer of the Assa

Channel Island shares of the mother company to the bank" was not a problem

because "understanding has always been that the ownership of the mother

company was with Bank Melli"); App'x 10346–53 (corporate records

documenting ownership of Assa's shares from 1989 to 1993).  Moreover, Alavi, in

49

its verified petition seeking leave of the New York Supreme Court to transfer ownership of the Building to 650 Fifth Ave. Co., concealed Bank Melli's true ownership of Assa by identifying Behdadfar and Kakavand as owners, misrepresenting that the Assa-Alavi partnership was an "arms-length transaction." App'x 6152.

Record evidence from before 1995 also shows that even after Bank Melli became the record owner of Harter Holdings (and, through it, of Assa), Bank Melli intended to conceal its involvement with these straw entities. *See* App'x 7094 (1993 letter from Bank Melli department stating that ownership of Harter and Assa Limited was transferred to Melli in part because, with their Channel Islands registration, "accessing the ownership backgrounds of the companies behind the captioned corporation is not an easy task for investigators," and asking "whether Mr. Naghshineh – the Assa Corp New York Director whose affiliation with the Bank could be easily proven – could be replaced with another individual whose affiliation with the Bank could not be easily proven"); App'x 7103 (1994 letter from Bank Melli department to director of Bank Melli New York asking him to "estimate the percentage of risk of the seizure of [U.S. properties] in case of the revelation of the ownership by Assa Corporation"). Such evidence

of Bank Melli's pre-1995 intent to conceal its ownership of Assa behind straw entities and purchasers is probative, though not determinative, of Bank Melli's similar intent in seeming to transfer Assa ownership for trivial consideration to even more remote straw purchasers in 1995. *See, e.g.*, Fed. R. Evid. 403, 404(b)(2).

Fourth, after 1995, Assa's sole United States representative, Tafti, continued to communicate on management matters with ONSD, which had been involved in Assa's affairs since its creation, *see, e.g.*, App'x 6923–24, 7094, 7103, 9885. Notably, Tafti communicated with ONSD head Ghadimipour about structuring Assa's record ownership to avoid running afoul of sanctions on Iran. Tafti requested that Ghadimipour supply him with copies of Aghamiri's and Shakeri's signatures, and that he instruct Aghamiri and Shakeri to drop Iran as their residence to avoid the risk of capital in their names being frozen by the United States. *See* App'x 7129, 7156. Tafti further advised Ghadimipour that if a new Assa shareholder were selected, it should be someone who resided in a tax free country. *See* App'x 7134. Implicit in these communications is *Bank Melli*'s control of Assa shareholder selection to conceal its own prohibited interest in U.S. property. Communications purportedly from the "Assa shareholders" to

51

Tafti warrant no different conclusion because each is sent to, or from, an ONSD email address, thus further demonstrating Bank Melli's control.

In urging otherwise, Claimants suggest that Bank Melli was merely an intermediary between Assa and the record shareholders. But that hypothesis is a speculative one given the lack of evidence that Shakeri and Aghamiri ever exercised any control over Assa, participated in any of its decisions, or received any income therefrom. *See DiStiso v. Cook*, 691 F.3d at 229–30 (explaining that court reviewing motion for summary judgment "cannot credit a [nonmovant's] merely speculative or conclusory assertions"). Such speculation is further undermined by Tafti's failure to identify Assa's shareholders or to arrange a meeting with them despite repeated requests from Alavi's attorneys and representatives in the United States. *See, e.g.*, App'x 10691, 10694, 10697, 10709, 10713. Indeed, record evidence indicates that Tafti planned to address the "absence of Mr. Shakeri" at a meeting with Citibank either by explaining that Shakeri was on a vacation or that he had resigned as director and that Tafti and Assa's lawyer had become Assa's directors. App'x 7152. The record only bolsters the conclusion that Shakeri and Aghamiri were not *bona fide* owners of, and never exercised control over, Assa.

Despite the totality of evidence demonstrating Bank Melli's continued control over Assa after 1995, Claimants contend a genuine issue of material fact on that point is raised by the testimony of two former bank employees. Mohammad Karjooravy, the director of Bank Melli's New York office from 1986 to 1994 who was closely involved in the formation of Assa and 650 Fifth Ave. Co., testified that Bank Melli intended to be involved in the partnership "for a short time," and that he understood U.S. regulation to require Melli to divest its ownership interest within five years. App'x 10375, 10382–83. At best, this evidence demonstrates only Bank Melli's intent to divest its record ownership in Assa. It does not undermine, much less refute, record evidence showing that Melli did not intend to divest itself of actual ownership or control of Assa, or showing that the 1995 sale of Assa was not a *bona fide* transfer of control.

Gholamreza Rahi, an Assistant Director for Bank Melli's ONSD at the time of the formation of Assa and 650 Fifth Ave. Co., and the director of Bank Melli's New York office from 1994 to 2003, testified that he did not know who owned Assa after Bank Melli divested its indirect interest in 1995. Claimants contend that Rahi's "lack of knowledge . . . strongly suggests . . . that there was no ownership relationship between Bank Melli and Assa after 1995." Claimants Br.

46.  Rahi's ignorance, however, is not probative of Bank Melli's post-1995 relationship with Assa because the record evidence does not indicate that the New York office was involved in Assa's affairs after 1995.  Indeed, as discussed *supra*, after 1995, Bank Melli's ONSD was involved with Assa's affairs, and the record is devoid of testimony from a then-employee of *that* department regarding post-1995 ownership or control of Assa.

In sum, the record evidence convincingly demonstrates that Bank Melli, and therefore the Government of Iran, continued to control Assa after 1995, and admits no genuine issue of triable fact on that question. [25]

---

[25] While we agree with the District Court that the record evidence shows that there is no triable issue of fact as to the Government of Iran's continued control of Assa after 1995, we take exception to its suggestion that it could draw adverse inferences at summary judgment based on individuals' invocation of their Fifth Amendment privilege, *see In re 650 Fifth Ave. Summary Judgment Decision*, 2013 WL 5178677, at *15 n.28 (stating that court "may, but need not, draw an adverse inference based on a witness's assertion of his Fifth Amendment privilege" at summary judgment stage).  The District Court also suggested that it could impose Rule 37 sanctions on two of these persons for failing to appear for court-ordered depositions, by "assum[ing]" that their testimony would have "further supported the Government's case."  *Id.* at *15.  As we have previously held, a court may not draw negative inferences against a nonmoving party on a summary judgment motion.  *See Stichting Ter Behartiging Van de Belangen v. Schreiber*, 407 F.3d 34, 55 (2d Cir. 2005).  We need not pursue the error further in this case, however, because, ultimately, the lack of testimony from those witnesses meant that there was no record evidence to dispute the overwhelming evidence of Bank Melli's post-1995 control of Assa.  *See In re 650 Fifth Ave. Summary Judgment Decision*, 2013 WL 5178677, at *22.

## 2. Alavi's Knowledge of Bank Melli's Post-1995 Ownership and Control of Assa

While the record admits no factual dispute as to Bank Melli's ownership

and control of Assa after 1995, there is a genuine dispute of fact as to whether

Claimant Alavi knew of that ownership.[26]  The Claimants offered several post-

1995 letters from Alavi employees and attorneys to Assa representatives

inquiring about the identity of Assa's "owners" or "stockholders."  For example,

in 1995, Alavi's counsel asked Assa's counsel to identify Assa's new owners.

Also in 1995, Mohammad Geramian ("Geramian"), the President of Alavi from

1991 to 2007, inquired as to Assa's new owners.  In 2003 and in 2007, new counsel

at Alavi sent letters to Assa's counsel inquiring about Assa's owners and

---

[26] We here refer only to Alavi's knowledge because, as the 60% owner of 650 Fifth Ave. Co., its knowledge would be imputed to the Partnership.  *See* N.Y. Partnership Law § 23 ("Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner.").

Relying on this same principle, the Government argues that, regardless of Alavi's knowledge, Assa's knowledge of its true ownership and control can be imputed to 650 Fifth Ave. Co.  The District Court, however, did not reach this question, and, in light of Claimants' argument that Assa's knowledge cannot be imputed to the Partnership because Assa defrauded both the Partnership and Alavi—a matter that may require further factual development—we leave it to the District Court to consider this question in the first instance.

directors and requesting a meeting with them.  Moreover, Abbas Mirakhor

("Mirakhor"), a member of Alavi's Board of Directors from approximately 1991–

2005, provided deposition testimony that he did not know who the actual

owners of Assa were, despite Alavi's "good faith efforts" to identify them.

App'x 5721.  Mirakhor testified that he had no reason to believe that the other

members of the Board knew either.  This evidence, viewed most favorably to

Alavi, could allow a reasonable jury to find that the Government failed to carry

its burden on the issue of Alavi's knowledge of Bank Melli's (and, therefore,

Iran's) continuing ownership and control of Assa after 1995.

In concluding otherwise, the District Court relied almost exclusively on

pre-1995 evidence, observing that "Alavi's own documents [from this time

period] are replete with references to board members' awareness of the decision-

making authority of the Ayatollah over the composition of the Foundation's

board, of the role that the Iranian Ambassador was to play in the Foundation's

business with respect both to the Building and its charitable activities."  *In re 650*

*Fifth Ave. Summary Judgment Decision*, 2013 WL 5178677, at *18.  A court cannot

conclude, as a matter of law, that pre-1995 knowledge demonstrates post-1995

knowledge.

Nor can such a conclusion be reached based on notes in Ebrahimi's journal, specifically the note inscribing "Assa → Bank Melli 40% share." App'x 7109–10. Even if this note, together with the totality of evidence, might permit a factfinder to conclude that Alavi knew of Bank Melli's post-1995 control of Assa, they do not compel that conclusion as a matter of law. A reasonable juror could conclude that the note reflects only the pre-1995 assignment of a 40% share of 650 Fifth Ave. Co. to Bank Melli (through Assa) in return for Melli's 1989 financing of tax-avoidance transactions. Notes from the Khazaee–Jahedi meeting are no more conclusive as to Alavi's knowledge of Bank Melli's or the Government of Iran's post-1995 control over Assa.

In sum, because testimonial and documentary evidence raises a genuine dispute as to whether Alavi was aware of Bank Melli's continuing ownership and control of Assa after 1995, this issue cannot be resolved by summary judgment. Further, because a triable issue exists as to Alavi's knowledge of Bank Melli's ongoing ownership or control, it necessarily follows that a triable issue exists as to whether the Claimants "intended specifically" to provide services to the Government of Iran, by way of Bank Melli, in providing services to Assa after 1995. 31 C.F.R. § 560.204. The Government may ultimately prove these disputed

issues of knowledge and intent at trial, but the question cannot be answered as a matter of law so as to support summary judgment on the Government's claim that these Claimants committed a forfeitable offense under IEEPA and the ITRs. We therefore vacate the summary judgment award on these claims as to these Claimants and remand for further proceedings, including trial.

## B. The Money Laundering Theory of Forfeiture

The Government's second civil forfeiture claim arises under the money laundering statutes.  In relevant part, the civil forfeiture statute states:

> (a)(1) The following property is subject to forfeiture to the United States:
>
> > (A) Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

18 U.S.C. § 981(a)(1)(A).  To show that the property was "involved in" such a transaction, the Government has the burden of proving that "there was a substantial connection between the property and the offense."  *Id.* § 983(c)(3). The Government claims that Alavi and 650 Fifth Ave. Co. committed a forfeitable offense by committing three types of money laundering violations prohibited by

§ 1956: promotion money laundering, concealment money laundering, and international money laundering. In relevant part, § 1956 states:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A) [Promotion] (i) with the intent to promote the carrying on of specified unlawful activity; or (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

(B) [Concealment] knowing that the transaction is designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of an offense] . . . .

(a)(2) [International] Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

(A) with the intent to promote the carrying on of specified unlawful activity; or

(B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation,

transmission, or transfer is designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law,

shall be [guilty of an offense].

*Id.* § 1956(a)(1)(A)–(B), (a)(2).

Knowledge of unlawful activity—or intent to carry out an unlawful activity—is an element of every one of the three money laundering offenses. To secure summary judgment based on promotion or concealment money laundering, the Government must show, *inter alia*, that there is no genuine dispute that the Claimants knew that "property involved in a financial transaction represents the proceeds of some form of unlawful activity." *Id.* § 1956(a)(1). To secure summary judgment based on international money laundering, the Government must show, *inter alia*, no genuine dispute that the Claimants either (1) intended to promote the carrying on of a specified unlawful activity, or (2) knew that the funds being transferred were proceeds of specified unlawful activity. *Id.* § 1956(a)(2); *accord United States v. Ness*, 565 F.3d 73, 77 (2d Cir. 2009).

Here, the Government alleges that the Claimants engaged in proscribed

money laundering by committing IEEPA violations. As discussed above,

however, whether Claimants violated the IEEPA depends on the disputed

question of Claimant Alavi's knowledge of Bank Melli's post-1995 control of

Assa, which gives rise to a triable issue as to its culpable intent in providing

services to Assa pursuant to their partnership in 650 Fifth Ave. Co. These

material issues preclude determining Claimants' involvement in money

laundering violations as a matter of law and, thus, require us to vacate the award

of summary judgment on this claim for forfeiture and to remand the case for

further proceedings.[27]

## II. The Statute of Limitations Defense

To avoid running afoul of the statute of limitations, the Government must

file its civil forfeiture action "within five years after the time when the alleged

[forfeitable] offense was discovered." 19 U.S.C. § 1621. In their answer to the

complaint, the Claimants asserted that "[t]he Government's claims are barred, in

---

[27] Because we vacate the District Court's award of summary judgment on both the
IEEPA and money laundering theories of forfeiture, we need not consider Claimants'
challenge to the District Court's determination as to which of their property interests
"constitute[] or [are] derived from proceeds traceable to" an IEEPA violation, 18 U.S.C.
§ 981(a)(1)(C), or were "involved in a transaction or attempted transaction in violation
of section 1956 . . . or . . . traceable to such property," *id.* § 981(a)(1)(A).

whole or in part, by the statute of limitations." App'x 2570. However, the Claimants did not move for summary judgment on this defense, and the Government did not argue that it was entitled to summary judgment on the defense in its motion. Nonetheless, the District Court raised and decided the statute of limitations defense *sua sponte*, entering summary judgment in favor of the Government. *In re 650 Fifth Ave. Summary Judgment Decision*, 2013 WL 5178677, at \*36. The District Court reasoned that it "scoured the record to determine if there is a triable issue as to this defense" and determined that there was no triable issue. *Id.*

This decision was in error. The Federal Rules state that a court may grant summary judgment *sua sponte* only "[a]fter giving notice and a reasonable time to respond" and "after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that [it] had to come forward with all of [its] evidence."). While we have held that "it is not necessarily reversible error in our Circuit for a district court to grant summary judgment against the moving party without notice or

opportunity to defend," we have "firmly discouraged" even that practice and "made clear that grants of summary judgment without notice will be tolerated only . . . when the facts before the district court were fully developed so that the moving party suffered no procedural prejudice." *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 139 (2d Cir. 2000) (internal quotation marks omitted). We have emphasized that "care should be taken by the district court to determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried." *Schwan-Stabilo Cosmetics GmbH v. Pacificlink Int'l Corp.*, 401 F.3d 28, 33 (2d Cir. 2005) (alterations and internal quotation marks omitted).

Here, the District Court granted summary judgment against the non-movant Claimants' statute of limitations defense without affording the Claimants any—let alone a full and fair—opportunity to present evidence as to the applicability of the defense. *In re 650 Fifth Ave. Summary Judgment Decision*, 2013 WL 5178677, at *3, *36–38. The Claimants had no notice that the District Court would consider their statute of limitations defense because the Government did not seek summary judgment on it or any other defense. Indeed, in its motion for summary judgment, the Government requested that the District Court afford it a

63

subsequent opportunity to address the Claimants' innocent owner defense if it initially granted summary judgment in its favor on the issue of "forfeitability of the defendants *in rem*." Dist. Ct. Dkt. No. 689 at 48, n.15. This effectively put the Claimants and the District Court on notice that the Government did *not* intend for the Claimants' affirmative defenses to be addressed on its summary judgment motion.

In light of the Government's express cabining of its summary judgment motion to its affirmative liability claims, it was particularly important for the District Court to put the Claimants on notice of its intention *sua sponte* to consider the statute of limitations defense, and to afford Claimants a reasonable opportunity to respond before deciding the issue against them. This is not a case where the record was so fully developed that Claimants plainly suffered no prejudice from the procedural error. *Cf. Bridgeway Corp.*, 201 F.3d at 139. In fact, it was hardly developed at all on the statute of limitations question.[28]

---

[28] The District Court had repeatedly denied Claimants' attempts to obtain discovery that might show when the Government learned of the Claimants' alleged forfeitable offenses. *See Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 80 (2d Cir. 2014) ("Before granting summary judgment *sua sponte*, . . . 'discovery must either have been completed, or it must be clear that further discovery would be of no benefit,' such that 'the record reflects the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment.'" (alterations omitted) (quoting *Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir. 1996))).

Accordingly, the District Court procedurally erred in *sua sponte* considering the

Claimants' statute of limitations defense and deciding in favor of the

Government. [29]

## III.    The Motion to Suppress

This Court reviews a district court's denial of a suppression motion for

clear error as to the district court's factual findings and *de novo* as to its legal

conclusions.  *United States v. Getto*, 729 F.3d 221, 227 (2d Cir. 2013).

### A. The Fourth Amendment Applies to the Seizures at Issue

The Fourth Amendment protects "[t]he right of the people to be secure in

their persons, houses, papers, and effects, against unreasonable searches and

---

[29] No different conclusion is warranted by *Johnson v. Board of Regents of University of Georgia*, 263 F.3d 1234, 1264 (11th Cir. 2001), which the District Court cites in support of its conclusion that the "Claimants bear the burden of demonstrating no triable issue as to this defense." *In re 650 Fifth Ave. Summary Judgment Decision*, 2013 WL 5178677, at *36.  In fact, controlling Supreme Court and Second Circuit case law sets forth the principle that a non-moving party must have some evidence permitting a reasonable juror to find in its favor with respect to an affirmative defense.  *See, e.g., Celotex*, 477 U.S. at 325; *FDIC v. Giammettei*, 34 F.3d 51, 54–55 (2d Cir. 1994).  Moreover, the District Court seems to have relied on *Johnson* for the proposition that the Claimants were obligated to raise the statute of limitations defense in their opposition papers; that proposition cannot be derived from *Johnson*.  First, *Johnson* concerned a motion for final summary judgment on all issues, not—as here—a motion for partial judgment that did not address the statute of limitations defense and that expressly contemplated further briefing and argument.  *See Johnson*, 263 F.3d at 1264.  Further, *Johnson* addressed a non-movant's failure to advance a particular *argument* in support of an issue on which a party had moved for summary judgment, not a failure to argue a distinct issue—here, an affirmative defense—on which the movant had never sought summary judgment. *See id*.  Thus, *Johnson* is inapposite to this case.

seizures." U.S. Const. amend. IV. It further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.* While the Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands," the Supreme Court has established "an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009) (internal quotation marks omitted). The exclusionary rule is "'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" *Id.* at 139–40 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).

It is well-established that the Fourth Amendment's exclusionary rule applies in forfeiture cases. *See 500 Delaware Street*, 113 F.3d at 312 n.3; *see also One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 696 (1965) (holding that the Fourth Amendment's protection against unreasonable searches and seizures applies in forfeiture proceedings); *Austin v. United States*, 509 U.S. 602, 608 n.4 (1993) (observing that "the [Supreme] Court has held that the Fourth Amendment's protection against unreasonable searches and seizures applies in

forfeiture proceedings"); *Krimstock v. Kelly*, 306 F.3d 40, 49 (2d Cir. 2002) (explaining that "[t]he Supreme Court has held that the Fourth Amendment protects claimants against unreasonable seizures of their property in the civil forfeiture context").

The District Court, however, concluded that there was no need to consider the Claimants' Fourth Amendment challenges to the seized evidence in this case because the Claimants' pre-existing civil discovery and production requirements "obviate[d] the need for any Fourth Amendment analysis." *In re 650 Fifth Ave. Suppression Decision*, 970 F. Supp. 2d at 211. In fact, discovery or production obligations do not displace Fourth Amendment protections. Rather, such obligations may trigger the inevitable discovery doctrine to shield from suppression even evidence seized in violation of the Fourth Amendment. *See United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992). Because we here identify a Fourth Amendment defect in the seizure warrant, we proceed to consider whether the Government demonstrated inevitable discovery. We conclude that the District Court failed to make the requisite findings with sufficient

particularity and, therefore, we vacate its suppression ruling and remand for

further proceedings consistent with this opinion.[30]

---

[30] The District Court also erred in ruling that the Claimants "waived" their Fourth Amendment right to challenge the reasonableness of the search and seizure by failing to raise an objection to civil discovery requests and comporting with the protective order. *In re 650 Fifth Ave. Suppression Decision*, 970 F. Supp. 2d at 212 ("By failing to so object [to its obligations under the protective order and in civil discovery], Alavi waived any such objection now."). In raising this waiver argument on appeal, the Government relies on cases in which the failure to object to discovery requests waived any objection to those requests. *See, e.g.*, *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992) (concluding that party arguing that Chinese law interfered with its ability to comply with discovery requests waived any such objection where it failed to object within time required by Fed. R. Civ. P. 33 and 34); *In re United States*, 864 F.2d 1153, 1156 (5th Cir. 1989) (explaining that, "as a general rule, when a party fails to object timely to interrogatories, production request or other discovery efforts, objections *thereto* are waived"). Yet Claimants do not object to the civil discovery requests, which are wholly separate from the warrant authorizing the challenged search. Rather, Claimants contend that the Government unlawfully seized materials from their office based on a deficient warrant and, thus, should not be permitted to rely on those materials in this case. Claimants raised the possibility of asserting such a challenge in March 2012—before complying with their civil discovery obligations in May and July 2012—but explained to the District Court at that time that they were waiting for the Government to produce the warrant and supporting materials. *See* App'x 2636–37. Nor is there any contention that Claimants thereafter failed timely to file their suppression motion: the District Court did not set a deadline for Claimants' motion to suppress, *cf.* Fed. R. Civ. P. 16, and it was filed prior to the date on which the parties filed their summary judgment motions, and before the then-scheduled trial start date of September 9, 2013, *see* Fed. R. Crim. P. 12(b)(3)(C), (c)(1) (providing that deadline to file motion to suppress evidence, if not otherwise set by court, is "start of trial"). In these circumstances, we cannot conclude that Claimants waived their Fourth Amendment challenge. As discussed herein, however, compliance with discovery obligations may affect the inevitable discovery analysis.

**B. The Warrant Was Constitutionally Defective**

The Fourth Amendment requires a search warrant "particularly [to] describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Such particularity is necessarily tied to the Amendment's probable cause requirement. "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). Thus, for a warrant to meet the particularity requirement, it must identify the alleged crime for which evidence is sought. *See United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992) (observing that warrant lacked particularity where "[n]othing on the face of the warrant tells the searching officers for what crime the search is being undertaken"); *United States v. Galpin*, 720 F.3d 436, 447 (2d Cir. 2013) (holding that search warrant generally authorizing police officers to search defendant's physical property and electronic equipment for evidence of "NYS Penal Law and or Federal Statutes" violated the particularity requirement (internal quotation marks omitted)).

In *Groh*, the Supreme Court stated that the Fourth Amendment's particularity requirements must be satisfied "in the warrant, not in the supporting documents." *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). However, "a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." *Id.* at 557–58. Thus, for a warrant to be sufficiently particular, the alleged crimes must appear in either (1) the warrant itself, or (2) in a supporting document if the warrant uses appropriate words of incorporation and if the supporting document accompanies the warrant. *See id.* But for an attached affidavit properly to be incorporated into a warrant, the warrant must contain "deliberate and unequivocal language of incorporation." *United States v. Waker*, 534 F.3d 168, 172–73 & n.2 (2d Cir. 2008) (per curiam) (finding supporting affidavit incorporated by reference in warrant where it was attached to warrant, warrant stated that supporting affidavit "is incorporated herein by reference," and magistrate had "initialed the [relevant] portion of the attached affidavit" (internal quotation marks omitted)); *see also Groh*, 540 U.S. at 557–58. Language in a warrant that simply references an underlying affidavit does not incorporate

70

the affidavit so as to allow the documents together to satisfy the particularity requirement. *See Groh*, 540 U.S. at 554–55 (concluding that, although warrant referenced affidavit insofar as it "recite[d] that the Magistrate was satisfied the affidavit established probable cause," warrant "did not incorporate by reference" list of items to be seized that was contained in application); *George*, 975 F.2d at 76 (holding "recitation in . . . warrant that it [was] issued upon the basis of an application and affidavit" insufficient to incorporate affidavit by reference (internal quotation marks omitted)).

On its face, the warrant in this case plainly lacked particularity as to the crimes at issue. Indeed, the Government concedes this point. *See* Government Br. 81 (acknowledging that "warrant should have listed the alleged offenses, but did not"). Nor did the warrant particularize categories of computerized information for which there was probable cause to seize, or the temporal scope of the materials that could be seized. Instead, the warrant authorized the search and seizure of (1) "[a]ny and all . . . documents or records concerning or relating to the ownership of, rental of, mortgaging of, or investing in [Assa, 650 Fifth Ave. Co., Alavi, or Bank Melli Iran]," (2) "[a]ny and all documents concerning or relating to financial books and records, bank accounts, disbursements, money

transfers or employment records of [Assa, 650 Fifth Ave. Co., Alavi, or Bank Melli Iran] or any of the officers and employees of these entities," and, most broadly, (3) "[a]ny and all computers; central processing units; external and internal drives; external and internal storage equipment or media; computerized data storage devices; hard disks or floppy disks; CD-ROMs[;] . . . and related or connected computer or data storage equipment" located on the premises to be searched.[31]  App'x 5141.

---

[31] In *United States v. Ganias*, --- F.3d ----, 2016 WL 3031285, *8 n.23 (2d Cir. May 27, 2016) (en banc), a criminal defendant did not challenge the scope or validity of a warrant that the district court had found to authorize the Government to mirror the defendant's hard-drives for off-site review.  The defendant also did not challenge the district court's finding that, absent mirroring for off-site review, on-site review would have taken months, and mirroring thus minimized any intrusion on Ganias's business. *Id.*  Similar to the warrant in *Ganias*, in this case, the warrant stated that searching computerized information for evidence of crime often requires seizure of "most or all of a computer system's input/output peripheral devices" to permit off-site review, and set forth procedure for determining whether off-site review here was necessary.  App'x 5177–81; *compare Ganias*, 2016 WL 3031285, at *2 n.4 (describing affidavit accompanying warrant application that offered reasons as to "why it was necessary for the agents to take entire hard drives off-site for subsequent search").  The Federal Rules of Criminal Procedure authorize warrants of this nature.  Fed. R. Crim. P. 41(e)(2)(B) (which, as amended in 2009, permits a warrant to "authorize the seizure of electronic storage media or the seizure or copying of electronically stored information," and notes that "[u]nless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant"); Fed. R. Crim. P. 41(e)(2)(B) advisory committee's note to 2009 amendments (explaining that, because "[c]omputers and other electronic storage media commonly contain such large amounts of information that it is often impractical for law enforcement to review all of the information during execution of the warrant at the search location[, t]his rule acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what

While the Ennis affidavit supporting the warrant does reference the potential charges for which evidence was sought, noting that "Bank Melli is subject to the Iranian Transactions Regulations . . . and Assa Co.'s interest in the Building and its rents is subject to civil forfeiture, as fully set forth in" the initial 2008 complaint against Assa and Bank Melli, that affidavit was neither attached to the warrant nor incorporated by deliberate and unequivocal language. The warrant only referenced the affidavit. *See* App'x 5140 ("Affidavit(s) having been made before me by Special Agent George Ennis . . . ."); *id.* ("I am satisfied . . . that the grounds for application for issuance of the search warrant exist as stated in the supporting affidavit(s) . . . ."). Thus, even assuming that the affidavit can be construed to signal that only evidence relating to the alleged forfeitable offenses was to be seized, the failure of deliberate incorporation precludes a reviewing

---

electronically stored information falls within the scope of the warrant").

*Ganias*, however, made no ruling with respect to the particularity requirement in the digital age. *See Ganias*, 2016 WL 3031285, at *2 & n.3, *8 n.23 (explaining that defendant did not challenge validity of 2003 warrant that authorized government to mirror hard drive for off-site review where (1) scope of computer data responsive to warrant was limited to two accounting clients, and (2) warrant specified non-exhaustive list of digital search procedures). Here, the warrant did not limit the computer search by reference to a particular crime, particular entities (*e.g.*, Assa, 650 Fifth Ave. Co., or Bank Melli), or particular search techniques.

court's reliance on the affidavit to cure the warrant's lack of particularity. *See*

*Groh*, 540 U.S. at 557–58.[32]

---

[32] Insofar as Claimants also argue that (1) the warrant was not supported by the probable cause demanded by the Fourth Amendment, and (2) the Government's execution of the search and seizure exceeded the scope of the authorization, a panel majority, not including the author of this opinion, concludes that the first argument fails on the merits. First, affording "considerable deference to the probable cause determination," the majority here concludes that the magistrate judge had a "substantial basis" for thinking that probable cause existed. *United States v. Thomas*, 788 F.3d 345, 350 (2d Cir. 2015) (internal quotation marks omitted). The totality of the information provided in the Ennis affidavit and the initial forfeiture complaint attached thereto demonstrated that (1) Alavi assisted Bank Melli's concealment of its Assa ownership through the 1989 tax transaction, (2) Bank Melli continued to own Assa and receive Building-generated income after the 1995 sanctions, and (3) Alavi remained a partner with Assa in 650 Fifth Ave. Co. *See* App'x 5142–74. There was, therefore, a "fair probability" that Alavi was providing and Bank Melli receiving services through 650 Fifth Ave. Co. in contravention of the ITRs and that evidence of that crime would be found in Claimants' office. *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) (explaining that "probable cause to search is demonstrated where the totality of circumstances indicates a fair probability that . . . evidence of a crime will be found in a particular place" (internal quotation marks omitted)).

Second, Claimants' conclusory argument that the search itself went beyond the warrant's terms fails because they do not identify any particular item upon which the Government relies that was seized outside the scope of the warrant, either to demonstrate that particular items should be suppressed or that the FBI flagrantly disregarded the warrant's limitations. *Cf. United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) (explaining that "when items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items, not invalidation of the entire search," unless it is shown that "those executing the warrant acted in flagrant disregard of the warrant's terms" (internal quotation marks omitted)).

## C. The Inevitable Discovery Exception to Suppression

"Under the 'inevitable discovery' doctrine, evidence obtained during the course of an unreasonable search and seizure should not be excluded if the government can prove that the evidence would have been obtained inevitably without the constitutional violation." *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006) (other internal quotation marks omitted) (citing *Nix v. Williams*, 467 U.S. 431 (1984)). The inevitable discovery doctrine "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred." *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992) ("*Eng I*") (emphasis in original); *accord United States v. Eng*, 997 F.2d 987, 990 (2d Cir. 1993) ("*Eng II*") (same). "[P]roof of inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." *Eng I*, 971 F.2d at 859 (emphasis and internal quotation marks omitted); *accord Eng II*, 997 F.2d at 990.

To show that the inevitable discovery exception to the exclusionary rule applies, the burden is on the Government to "prove that each event leading to

the discovery of the evidence would have occurred with a sufficiently high degree of confidence for the district judge to conclude, by a preponderance of the evidence, that the evidence would inevitably have been discovered." *United States v. Vilar*, 729 F.3d 62, 84 (2d Cir. 2013). We have previously characterized the Government's obligation as one of "certitude" that the evidence would have been discovered. *Heath*, 455 F.3d at 58 n.6.

In *Eng I* and *Eng II*, we identified the need to guard against government actions taken "as an after the fact insurance policy to validate an unlawful search under the inevitable discovery doctrine" and, toward that end, set forth courts' procedural obligations in making inevitable discovery determinations. *See Eng I*, 971 F.2d at 861 (internal quotation marks omitted); *accord Eng II*, 997 F.2d at 989–90. The facts at issue in *Eng I* and *Eng II* bear repetition here. In February 1989, federal officials investigated the defendant for narcotics and money laundering violations. *Eng I*, 971 F.2d at 856. In the course of this investigation, the officials unlawfully searched and seized contents of the defendant's safe without a warrant, violating the Fourth Amendment. *Id.* at 856–58. Unlawfully obtained evidence from that safe prompted an investigation of defendant on separate charges for tax evasion, with the government eventually issuing subpoenas to

banks and other entities for evidence supporting such tax charges. *Id.* at 857–58.

After defendant was charged with three counts of tax evasion, he moved to

suppress certain evidence as derived from the unlawful search of his safe. *Id.* at

857–59. The district court concluded that the inevitable discovery doctrine

applied and admitted all of the challenged evidence. *Id.* at 858–59.

On appeal, *Eng I* laid out (and *Eng II* reiterated) a two-step process for

making inevitable discovery determinations. *Id.* at 861–62; *Eng II*, 997 F.2d at

989–90. First, the court must evaluate "the progress of the investigation at the

time of the government misconduct" to determine whether "an active and

ongoing investigation . . . was in progress at the time of unlawful search." *Eng I,*

971 F.2d at 861–62; *see Eng II,* 997 F.2d at 989–90. At this step, the government

must establish that the investigation was not "triggered or catalyzed by the

information unlawfully gained" by the illegal search but, rather, that "the

alternate means of obtaining the [challenged] evidence" was, "at least to some

degree, imminent, if yet unrealized" at the time of the unlawful search. *Eng I,*

971 F.2d at 861 (alterations and internal quotation marks omitted); *see Eng II,* 997

F.2d at 989–90, 992. Second, the "court must, *for each particular piece of evidence,*

specifically analyze and explain how, if at all, discovery of that piece of evidence

would have been more likely than not inevitable absent the [unlawful] search."

*Eng I*, 971 F.2d at 862 (emphasis added) (internal quotation marks omitted); *see*

*Eng II*, 997 F.2d at 989–90.  Applying these standards in *Eng*, we ruled that a

subpoena issued contemporaneously with an unlawful search was not enough to

"validate an unlawful search under the inevitable discovery doctrine."  *Eng I*, 971

F.2d at 861 (internal quotation marks omitted).  As we subsequently explained, in

language particularly relevant in this case, the "detailed showings of each of the

contingencies involved" in the *Eng* formulations are necessary to avoid

encouraging "officers to *obviate or nullify the Fourth Amendment's warrant*

*requirement* by baldly asserting that they inevitably would have had the probable

cause needed to obtain a warrant."  *Heath*, 455 F.3d at 64 (emphasis added)

(alterations and internal quotation marks omitted).

This precedent makes clear that Claimants' civil discovery and protective

order obligations were not enough, by themselves, to support a conclusion that

the Fourth Amendment was "not implicated" in the suppression challenge

presented.  *In re 650 Fifth Ave. Suppression Decision*, 970 F. Supp. 2d at 212–13.

Moreover, this precedent precludes a general conclusion that all of the evidence

seized pursuant to the challenged warrant was nonetheless admissible in the

Government's forfeiture action because it would have been inevitably discovered in civil discovery or as a result of the protective order. In reaching that conclusion here, the District Court reasoned in two paragraphs of factual findings that "[a]s to Alavi, such historical facts exist and demonstrate inevitable discovery" for all of the evidence seized in the December 2008 search because "[t]he pre-existence of civil litigations which each carried common law preservation obligations, the production obligations under the Federal Rules of Civil Procedure, and the fact that Alavi failed to object to the scope of those obligations and actually produced the disputed documents moot the constitutional question central to this motion." *Id.* at 213.

This analysis was insufficient to support a finding that the Government would inevitably have discovered the entire contents of Alavi's computers, electronic storage devices, servers, and over 200 boxes of documents pursuant to the protective order and civil discovery obligations. Specifically, the District Court failed to make clear that it was "viewing affairs as they existed at the instant before the unlawful search," and making particularized findings as to "what *would have happened* had the unlawful search never occurred." *Eng I*, 971 F.2d at 861 (emphasis in original); *see In re 650 Fifth Ave. Suppression Decision*, 970

F. Supp. 2d at 211–13.  The former consideration should properly have been informed by (1) the initial civil forfeiture action, filed on December 17, 2008, which sought forfeiture only of Assa's assets, although it discussed in detail the history of Alavi and 650 Fifth Ave. Co.; (2) the District Court's December 17, 2008 protective order in that action, which, among other things, (a) required 650 Fifth Ave. Co. to make available for inspection to the United States all of its books and records and (b) prohibited any person or entity with actual knowledge of the protective order from destroying documents relating to the forfeiture complaint's allegations; (3) the December 17, 2008 grand jury subpoena to Alavi seeking all documents relating, or referring, to Assa, 650 Fifth Ave. Co., and Bank Melli, for the period January 1989 to December 2008; and (4) Jahedi's observed destruction of documents responsive to that subpoena the following day.  With respect to these pre-search events, we make several observations.

First, in explaining that "Alavi was under a pre-existing duty prior to the 2008 search to *provide* its books and records to the Government for inspection— all of them," the District Court overstated Alavi's obligations under the protective order.  *In re 650 Fifth Ave. Suppression Decision*, 970 F. Supp. 2d at 211– 12 (emphasis added).  That order imposed no production obligation on Alavi;

80

rather, it prohibited "[a]ll persons and entities having actual knowledge of [the] Protective Order" from "destroy[ing] any documents relating in any manner or part to the allegations in the [2008 forfeiture] Complaint." App'x 5185. Insofar as the protective order required 650 Fifth Ave. Co., a separate entity of which Alavi is a 60% owner, to make its books and records "available for inspection to the United States," *id.* at 5186, the District Court failed to explain how that inspection obligation would have resulted in the Government inevitably obtaining possession of such records. *See, e.g.*, *Nix*, 467 U.S. at 447 (establishing that, under the "inevitable discovery" doctrine, evidence *obtained* during the course of an unreasonable search and seizure should not be excluded "if the government can prove that the evidence would have been *obtained* inevitably" without the constitutional violation (emphasis added)); *accord Heath*, 455 F.3d at 55. Logically, an obligation to make a massive quantity of materials available for inspection does not mean that the authorized inspector will inevitably obtain each individual material made available. Here, it is not manifest that the Government would have obtained *every* item seized from Alavi—computers, electronic storage devices, servers, and over 200 boxes of documents—pursuant

to 650 Fifth Ave. Co.'s obligation to make certain documents available (or Alavi's obligation not to destroy certain documents).

Second, the District Court failed to explain how the Government would have obtained every item of seized evidence in the pre-existing civil suit, whether pursuant to the Claimants' production obligations or through civil discovery. The only action pending at the time of the search was the initial civil forfeiture action, which related to Assa's property and which imposed upon Claimants, at most, a common law obligation of preservation.[33] *See Kronsich v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) (explaining that "obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation—most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation"). Thus, for the same reasons just discussed with respect to the protective order, further findings are necessary to

---

[33] Although the relevant inquiry here is whether the *Government* would inevitably have obtained the challenged documents, we note that at the time of the December 19, 2008 search none of the judgment creditor actions had been filed against Claimants and, therefore, Claimants had no production obligations with respect to those litigations at the time of the challenged search.

conclude that any common law preservation obligation would inevitably have resulted in the Government obtaining each item of seized evidence.

Third, insofar as the Government here relies on the December 17, 2008 subpoena, we note that the District Court did not rely on that subpoena in reaching its inevitable discovery conclusion.  Thus, we leave it to that court on remand to determine whether the Government has carried its burden to show that "a response to the subpoena producing the evidence in question" was inevitable.  *Eng I*, 971 F.2d at 860.

Finally, we are mindful that, in 2012, in response to a joint document request from the Government and judgment creditors, Claimants did produce the same documents that were seized during the December 2008 search.  The Government, however, sought those documents from Alavi and 650 Fifth Ave. Co. only after amending its complaint to seek forfeiture of their interests.  Many of the amended complaint's allegations against Alavi and 650 Fifth Ave. Co. derived from documents seized during the December 19, 2008 search.  On this record, we cannot confidently conclude that a request for production in the *amended* forfeiture action was not tainted by the challenged search so as to admit a finding of inevitable discovery.  *Cf. Vilar*, 729 F.3d at 84–85 (concluding that

evidence was properly admitted under inevitable discovery doctrine despite unlawful search because documents were subsequently produced pursuant to grand jury subpoena and, among other things, "the subpoena was not issued on the basis of any information unlawfully seized" from defendant's office).

This is not to say that the Government lacked sufficient evidence to commence a forfeiture action against Alavi and 650 Fifth Ave. Co. before the challenged search. Indeed, based on facts alleged in the initial forfeiture complaint and issuance of the December 17, 2008 subpoena, the Government's investigation may well have been sufficiently advanced prior to the December 19, 2008 search to make both Claimants' addition to the forfeiture complaint even without the unlawfully seized evidence and, therefore, their disclosure obligations, inevitable. Because the District Court declined to consider this argument below, however, the record does not now permit us to reach such a conclusion. Rather, the District Court may consider this issue on remand. *See Eng I*, 971 F.2d at 861–62 (explaining that "inevitable discovery analysis logically must begin with the progress of the investigation at the time of the government misconduct," and that court conducting such analysis must determine what

would have happened "in light of what the government knew and was pursuing at the moment before the unlawful search").

In remanding this case to the District Court, we note that the Supreme Court has long rejected the notion that the Government can circumvent the exclusionary rule by using lawful processes to obtain evidence that it previously seized illegally. *See Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920). In the enduring words of Justice Holmes, "[t]he essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." *Id.* at 392. Allowing the Government to immunize an illegal search simply by obtaining the evidence in a subsequent legal request would "reduce[] the Fourth Amendment to a form of words." *Id.*; *see also Calandra*, 414 U.S. at 362. Thus, we cannot rubber stamp the Government's assertion that it would have inevitably discovered unlawfully obtained evidence in a subsequent lawful mechanism simply because the latter mechanism is pursued. To secure an exception from the exclusionary rule on the ground of inevitable discovery, the Government must make a "detailed showing[] of each of the contingencies involved" and the District Court must find each contingency satisfied with

respect to each item of seized evidence.  *Heath*, 455 F.3d at 64 (internal quotation

marks omitted); *see also Eng I*, 971 F.2d at 861–62*; Eng II,* 997 F.2d at 989–90;

*United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013).

## D. The Good Faith Exception

On appeal, the Government argues, with some force, that, whether or not

the inevitable discovery exception applies, no suppression of evidence is

warranted in this case because the executing agents relied in good faith on the

December 19, 2008 search warrant.  *See United States v. Leon*, 468 U.S. 897 (1984);

*see also United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010) (explaining that

although unincorporated, unattached supporting documents cannot cure

constitutionally defective warrant, "those documents are still relevant to our

determination of whether the officers acted in good faith").  Because the District

Court did not address the Government's good-faith argument, we decline to

consider it for the first time on appeal.  Rather, we leave the Government to

pursue it on remand in the District Court.

**CONCLUSION**

To summarize, we conclude as follows:

1.     As to summary judgment ordering forfeiture of Claimants' property,

    (a)    the record admits no factual dispute as to Bank Melli's (and therefore Iran's) continuing ownership and control of Assa after 1995, but

    (b)    the record, viewed most favorably to Claimants, reveals disputes of fact as to Claimants' knowledge of that ownership, which preclude an award of summary judgment against them as to both the IEEPA and money laundering theories of forfeiture.

2.     The District Court procedurally erred in *sua sponte* considering and rejecting Claimants' statute of limitations defense without first affording the parties notice or a reasonable opportunity to be heard.

3.     As to the District Court's challenged denial of suppression,

    (a)    it is well settled that the Fourth Amendment applies in civil forfeiture actions;

(b)     where, as here, the Government concedes that evidence was

seized pursuant to a warrant lacking the requisite particularity,

civil orders of protection and production do not obviate Fourth

Amendment concerns, though they can trigger an inevitable

discovery exception to suppression;

(c)     the inevitable discovery exception requires a court to "view[]

affairs as they existed at the instant before the unlawful

search," and make particularized findings with respect to each

item of seized evidence as to "what would have happened had

the unlawful search never occurred," *United States v. Eng*, 971

F.2d 854, 861 (2d Cir. 1992); and

(d)     remand is required to allow the District Court to conduct the

requisite inevitable discovery analysis.

4.      On remand, the Government may pursue its argument that the

good-faith exception to suppression also applies in this case.  *See United States v.*

*Leon*, 468 U.S. 897 (1984).

Accordingly, the District Court's summary judgment is VACATED and the

case is REMANDED for further proceedings consistent with this opinion.